**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| MATTHEW KELSEY MARTINEAU, | CIVIL ACTION NO.: 2:24-cv-02387 |
| *Plaintiff*, | |
| | JUDGE SUSIE MORGAN |
| v. | |
| | MAGISTRATE JUDGE MICHAEL B. NORTH |
| BUNGIE, INC., a Delaware Corporation; DOES 1-10, inclusive, | |
| *Defendants*. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF BUNGIE, INC.'S MOTION TO DISMISS ALL COUNTS OF MARTINEAU'S COMPLAINT**</u>

1

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ............................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................. 3

    A.   Brief Description of Martineau's Work ............................................... 3

    B.   Brief Description of the Destiny Franchise ......................................... 4

        1.   "The Red War" Campaign ........................................................ 6

III. LEGAL STANDARD ON A MOTION TO DISMISS .......................................... 8

IV.  ARGUMENT ........................................................................................................ 8

    A.   Martineau Cannot Establish Factual Copying .................................... 9

        1.   Martineau Has Not Sufficiently Pled Bungie's Prior Access ..... 9

        2.   Martineau Has Not Sufficiently Pled Similarities Probative of Copying ................................................................................... 10

    B.   The Works Are Not Substantially Similar .......................................... 13

        1.   Unprotectable Element Filtration ............................................. 13

            i.    Scènes à Faire and Unprotectable Ideas ....................... 14

            ii.   Indistinctly and Superficially Expressed Elements ....... 18

            iii.  Unprotectable Characters ............................................. 20

            iv.   "The Red Legion" Title and Other Short Phrases are Unprotectable ............................................................. 21

    C.   The Works as a Whole are Not Substantially Similar ......................... 22

    D.   Martineau is Not Entitled to Statutory Damages or Attorneys' Fees .... 24

    E.   Bungie is Entitled to Its Attorneys' Fees & Costs .............................. 24

V.   CONCLUSION .................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdin v. CBS Broad., Inc.*,
  405 F. Supp. 3d 591 (S.D.N.Y. 2019)....................................................................14

*Abdin v. CBS Broad. Inc.*,
  971 F.3d 57 (2d Cir. 2020)..............................................................................15

*Allen v. Scholastic Inc.*,
  739 F. Supp. 2d 642 (S.D.N.Y. 2011)...........................................................20, 21

*Armour v. Knowles*,
  512 F.3d 147 (5th Cir. 2007) ........................................................................9, 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................8

*Atkinson v. Netflix, Inc.*,
  2022 WL 2899275 (E.D. Tex. May 18, 2022)............................................9, 10, 11

*Basile v. Los Angeles Film Sch., LLC*,
  2019 WL 5377126 (C.D. Cal. Sept. 30, 2019) ...............................................15

*Basile v. Sony Pictures Ent. Inc.*,
  2014 WL 12521344 (C.D. Cal. Aug. 19, 2014), *aff'd*, 678 F. App'x 473 (9th
  Cir. 2017) ....................................................................................................14

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................8, 9

*Benfer v. City of Baytown*,
  120 F.4th 1272 (5th Cir. 2024) ....................................................................3, 5

*Blizzard Entm't, Inc. v. Lilith Games (Shanghai) Co.*,
  149 F. Supp. 3d 1167 (N.D. Cal. 2015) ...........................................................20

*Buckman v. Citicorp*,
  1996 WL 34158 (S.D.N.Y. Jan. 30, 1996) ........................................................24

*Busti v. Platinum Studios, Inc.*,
  2013 WL 12121116 (W.D. Tex. Aug. 30, 2013)..........................................*passim*

*Cain v. Hallmark Cards, Inc.*,
  2016 WL 3189231 (M.D. La. June 6, 2016).......................................................10

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ............................................................8

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) ..........................................................20

*DuBay v. King*,
844 F. App'x 257 (11th Cir. 2021) ....................................................21

*Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*,
948 F.3d 261 (5th Cir. 2020) ............................................................24

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
26 F.3d 1335 (5th Cir. 1994) ............................................................14

*Guzman v. Hacienda Recs. & Recording Studio, Inc.*,
2014 WL 6982331 (S.D. Tex. Dec. 9, 2014) ....................................11

*Hunn v. Dan Wilson Homes, Inc.*,
789 F.3d 573 (5th Cir. 2015) ............................................................24

*Keck v. Mix Creative Learning Ctr., L.L.C.*,
116 F.4th 448 (5th Cir. 2024) ..........................................................24

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
12 F.3d 527 (5th Cir. 1994) .......................................................14, 16

*Kern River Gas Transmission Co. v. Coastal Corp.*,
899 F.2d 1458 (5th Cir.1990) .....................................................16, 18

*Kiely v. Universal Music Grp.*,
2019 WL 9443183 (C.D. Cal. Dec. 12, 2019) ....................................5

*Lewinson v. Henry Holt & Co.*,
659 F. Supp. 2d 547 (S.D.N.Y. 2009) ..............................................19

*Mego Corp v. Mattel, Inc.*,
1978 WL 21347 (S.D.N.Y. Sept. 29, 1978) ......................................15

*Nichols v. Universal Pictures Corp.*,
45 F.2d 119 (2d Cir. 1930) ..................................................18, 20, 21

*Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*,
783 F.3d 527 (5th Cir. 2015) .......................................................13, 14

*Positive Black Talk, Inc. v. Cash Money Records, Inc.*,
394 F.3d 357 (5th Cir. 2004) ..........................................................8, 9

*Randolph v. Dimension Films*,
  634 F. Supp. 2d 779 (S.D. Tex. 2009), *summarily aff'd* 381 F. App'x 449 (5th
  Cir. 2010) ........................................................................................................... *passim*

*Reliable Consultants, Inc. v. Earle*,
  517 F.3d 738 (5th Cir. 2008) .................................................................................8

*Rice v. Fox Broad. Co.*,
  330 F.3d 1170 (9th Cir. 2003) .............................................................................20

*Rucker v. Harlequin Enters., Ltd.*,
  2013 WL 707922 (S.D. Tex. Feb. 26, 2013) .............................................14, 18, 20

*Vallery v. Am. Girl Dolls*,
  2015 WL 1539253 (E.D. La. Apr. 6, 2015) .......................................................11, 22

*Vallery v. Am. Girl, L.L.C.*,
  697 F. App'x 821 (5th Cir. 2017) ........................................................................13

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
  241 F.3d 398 (5th Cir. 2001) ...............................................................................16

*Williams v. Crichton*,
  84 F.3d 581 (2d Cir. 1996).............................................................................18, 22

*Wooten v. Netflix, Inc.*,
  2021 WL 4864744 (N.D. Ga. May 25, 2021) .......................................................20

**Statutes**

17 U.S.C. § 412 ...........................................................................................................9, 24

17 U.S.C. § 505 ..............................................................................................................24

**Other Authorities**

4 Nimmer on Copyright § 13D.06 (2024) ............................................................11, 12

Fed. R. Civ. P. 12 .........................................................................................................12

Fed. R. Civ. P. 12(b)(6)..........................................................................................1, 3, 8, 24

Defendant, Bungie, Inc. ("Bungie"), submits this Memorandum of Law in support of its motion to dismiss all counts of the Complaint (Dkt. 1) filed by Plaintiff Matthew Kelsey Martineau ("Martineau"), pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion").

## I.  PRELIMINARY STATEMENT

It is the *sine qua non* of copyright law that the expression of an idea is protected, but not the idea itself.  If not for such a mandate, there would only be one photograph of Bourbon Street on Mardi Gras, one police thriller, or, for that matter, one science fiction story about aliens and space travel.  Another axiom of copyright law is that it protects only those elements of the work that are original; elements that are stock or "*scènes à faire*" to a genre cannot be claimed. Eschewing these doctrinal truths, Martineau attempts to use copyright law to claim ownership over science fiction's most common and beloved narrative elements and tropes.

In his Complaint, Martineau claims that Bungie's "thrilling and immersive" 2017 video game *Destiny 2* "is based directly on Martineau's source work"—a disjointed collection of short experimental writings that Martineau published piecemeal to his WordPress blog over an unspecified period of time in 2013 and 2014 and registered as a collective work a decade later in 2023 under the title *The Red Legion*.  But copyright law does not make Martineau the owner of mere concepts and ideas, much less those intrinsic to the science fiction and space fantasy genres, such as alien war beasts, imperial space legions, spaceships armed with planet-killing superweapons, and interstellar electronic communication.

Nonetheless, Martineau filed this meritless action for copyright infringement on October 7, 2024, nearly seven years after Bungie's release of *Destiny 2*, asserting ownership over and infringement of these stock elements and unprotectable ideas.  The allegations in his Complaint fail to set forth a colorable claim of copyright infringement for multiple reasons.  To claim infringement absent direct evidence of copying, which is absent here, Martineau must sufficiently

plead that (1) Bungie had access to Martineau's asserted work prior to creating *Destiny 2*—or that the works are "strikingly similar"—and (2) that there is a plausible showing of substantial similarity between the protectable elements of his blog posts and the expansive, interactive 3D audiovisual adventure of *Destiny 2*. Martineau's Complaint fails to meet either mark.

As set forth below, Martineau does not—and cannot—sufficiently plead access, as he alleges only that *The Red Legion* writings were originally posted to his publicly-available, online WordPress blog. But the mere presence of a work somewhere on the endless expanse of the internet is insufficient to plead access. Because the works are so dissimilar, Martineau likewise does not—and cannot—plausibly allege probative similarity, much less meet the higher bar of striking similarity required absent a showing of access.

Moreover, a side-by-side comparison of the works, which are incorporated by reference into Martineau's Complaint and which control the analysis, ends the substantial similarity inquiry as a matter of law. *Destiny 2* is nothing like Martineau's work—the plot is different, the characters are different, and the expression of any supposedly overlapping themes or concepts is markedly different. As much as Martineau strains to find similarities between the works through self-serving summaries and post-hoc rearrangement of his nonlinear writings, it is clear that no such similarities exist with respect to anything protectable. Indeed, every element Martineau identifies as "proof" of actionable copying is instead an archetypal example of an unprotectable idea or concept, particularly within the genres of sci-fi and space fantasy. As a result, his invalid copyright claim fails and cannot be rescued by amendment of his pleading.

Finally, Martineau seeks statutory damages and attorneys' fees. However, because he did not register his asserted work with the Copyright Office until 2023—more than six years following the release of *Destiny 2*—he is not entitled to either form of relief as a matter of law.

Accordingly, Bungie respectfully requests that the Court dismiss the Complaint with prejudice, and award Bungie its fees and costs incurred in defending against this meritless action.

## II.    FACTUAL BACKGROUND

### A.    Brief Description of Martineau's Work[1]

Martineau's work, which he titled *The Red Legion* at some point prior to his November 11, 2023 collective work copyright application, is a 115-page collection of free verse poems, lyrical odes, and shortform epistolary sci-fi and space fantasy writings about a small cast of alien and human beings that inhabit a universe caught in the throes of unending conflict across the galaxies and millions of years. *See* Ex. A.  Written under the *nom-de-plume* Caspar Cole, Martineau's work was published in a series of short blogposts between February 2013 and March 2014. *See id.*; Dkt. 1 at ¶¶ 14-15.  *The Red Legion* is incorporated by reference into the Complaint and has been placed before this Court as Exhibit A for the purposes of this Motion. *See Benfer v. City of Baytown*, 120 F.4th 1272, 1279 n.2 (5th Cir. 2024).

*The Red Legion* primarily focuses on Martineau's chief antagonist, the brutal alien warlord Yinnerah, and the military unit he commands—the titular "Red Legion." *See* Ex. A at 8; Dkt. 1 ¶ 20. *The Red Legion*'s plot unfolds through a series of fragmented tableaux that portray non-chronological glimpses of Yinnerah's rise to power from humble origins, his brutality, and his plotted invasion of Earth with the aid of his Red Legion, armed with weaponry referred to by the invented term, "atonizers." *See* Ex. A at 4-5, 17-28 42-43, 49-50; Dkt. 1 ¶¶ 17-23, 27.  Yinnerah and the Red Legion monitor Earth prior to the invasion and communicate telepathically across time and space via a process dubbed "transversion." *See* Ex. A at 4-5, 7-8; Dkt. 1 ¶¶ 30-31, 94. Martineau's work alludes to earlier races of beings inhabiting and returning to Earth, and a constant

---

[1] Because the Court must examine the works themselves for its similarity determination, *see infra* at 23, Bungie provides only brief descriptions to provide context to the Motion.

3

cycle of war millions of years before Yinnerah's conquest. *See* Ex. A at 52-53. Paradoxically, *The Red Legion* also mythologizes Yinnerah as a creator of Earth. *See id.* at 52-53, 61-62.

Among the momentary flashes of narrative action expressed in the work are scenes of Red Legion troops annihilating human settlements and each other in an act of mutiny, stranded legionnaires wrestling with their inevitable demise, a Red Legion engineer troubleshooting an issue with a spaceship's reactor, erotic and homicidal encounters involving members of Yinnerah's court, and instances of "transversion" communication. *See, e.g.*, Ex. A at 9-10, 15-16, 23, 33-34, 66-68, 115; Dkt. 1 ¶¶ 83(c), 112(a), 134(a), 150. The bulk of the tale is told through a nonsequential collection of "testaments" penned by Yinnerah's sycophant, Xionbur, in which he interweaves brief historical accounts involving Yinnerah and other characters (most of whom appear only once), alongside confessions, devotional praises, and prophesies of Yinnerah's might in hyperbolic and abstract verse. *See* Ex. A at 37-39, 54-86, 89-109, 114; Dkt. 1 ¶ 73. Other parts are told via messages and log entries (often incomplete), including those of Red Legion combatants, scientists, engineers, a "Blue Opposed" rebel, and Yinnerah himself. *See* Ex. A at 3-34, 73-74, 110, 115; Dkt. 1 ¶¶ 26-31, 118-19, 122-23. And others are told through a mix of unattributed free verse, panegyrics, cryptic prophecies, and third-person narratives. *See* Ex. A at 1-2, 35-53, 87-88. Most of the work is abstract verse not tethered to a linear plot.

###### B.     Brief Description of the *Destiny* Franchise

Bungie is the video game company responsible for developing the *Destiny* game franchise, which comprises the original *Destiny* game (first released September 9, 2014) and *Destiny 2* (first released September 6, 2017). *See* Declaration of Jonathan To ("Decl.") ¶¶ 4-5; Dkt. 1 at ¶ 32, 34, 43. Martineau's Complaint incorporates by reference the allegedly infringing work, *Destiny 2,* as

well as its precursor game, *Destiny*.[2]  Bungie places *Destiny 2* as a whole before the Court in the form of (1) a narrated video compilation of gameplay footage and cutscenes from both *Destiny* games, Decl. ¶¶ 7, 9; Ex. B, and (2) a video depicting representative gameplay footage and all interspersed cinematic cutscenes from *Destiny 2*'s "Red War" campaign, which features nearly all the allegedly infringing elements Martineau accuses in his Complaint.  Decl. ¶¶ 8-9; Ex. C.

Both *Destiny* games are set in the same post-dystopian, mythic sci-fi universe in which the remnants of humanity live in Earth's Last City, protected by the hovering presence of a huge, celestial white orb called the Traveler.  Ex. B at 2:43:04-48:30.  The Traveler is a source of Light, a mysterious, powerful force that can be wielded by the protectors of the Last City and the broader Solar System, known as the Guardians.  *Id.* at 2:00:53-1:57.  *Destiny* players are Guardians tasked with defending humanity from the encroaching threat of hostile alien races across various story campaigns, each with its own narrative arc, including the "Red War" campaign.  Decl. ¶ 6.

Because both *Destiny* installments are set in the same universe, many narrative elements from the original 2014 *Destiny* game are present in *Destiny 2*.  *Id.*  For example, both games allow players to select one of three character "races": (1) Humans, (2) "Awoken," humanoids with glowing eyes and colorful skin, or (3) "Exos," cyborg-esque "Exomind" robots uploaded with human consciousnesses.  *Id.*  Both games also feature a variety of enemy alien species—including the imperialistic and lizard-like Cabal, who organize their powerful military into Roman-esque "legions"—and incorporate technology ubiquitous in sci-fi, including spaceships, beacons, message encryption, superweapons, and sentient AI characters.  *See, e.g.*, *id.* at 1:07:56-13:07, 1:31:15-32:16, 1:44:30-48:30; 3:38:39-41:14, 4:08:10-9:38.

---

[2] *Benfer*, 120 F.4th at 1279 n.2. The first *Destiny* game is referenced at Dkt. 1 ¶¶ 32-33. Bungie notes its release date above for the Court's reference.  *Cf. Kiely v. Universal Music Grp.*, 2019 WL 9443183, at *2 (C.D. Cal. Dec. 12, 2019) (judicially noticing webpages showing release date of works referenced in FAC).

1.      **"The Red War" Campaign**

When Bungie released *Destiny 2* in September 2017, the original story campaign players

faced was "The Red War."  Decl. ¶ 8; Ex. C; *see also* Ex. B at 4:34:30-55:00.  The main antagonist

of the "Red War" campaign is the villainous Cabal leader, Dominus Ghaul.  Ex. C at 9:47-11:20.

Although born a runt, Ghaul grew in power under the tutelage of a disgraced Cabal scholar known

as the Consul and eventually seized control.  *Id.* at 1:53:51-56:07.  Ghaul's rise to power was in

part attributable to the Almighty—a massive spaceship armed with a devastating energy beam

capable of collapsing stars into supernovas and destroying entire solar systems.  *Id.* at 55:39-57:22.

The "Red War" campaign revolves around Ghaul's pursuit of the immortal, unstoppable power of

the Traveler's Light, and opens with Ghaul's surprise attack on the Last City, backed by the Cabal

military's elite Red Legion.  *Id.* at 0:39-1:53, 5:04-6:43, 27:00-28:13, 1:27:42-28:23.  Ghaul easily

subdued the Last City and caged the Traveler, cutting the Guardians off from its Light.  *Id.* at 1:53-

2:29.  For most of the "Red War," Ghaul studies the caged Traveler from his command ship and

tries convince the sentient orb to bestow its Light upon him.  *Id.* at 16:33-56.

Gameplay in the "Red War" campaign begins during the Cabal's surprise attack on the

Last City.  *Id.* at 3:39-4:19.  Playing as a Guardian who flees the Last City and finds an outpost

located near a discarded remnant of the Traveler that restores the Guardian's connection to the

Light, the player is first tasked with clearing out an abandoned mine overrun with hostile scavenger

insectoids called the Fallen and recovers a signal booster that restores the outpost's long-range

communications.  *Id.* at 20:48-23:19.  Guardian commander, Zavala, sends a message requesting

the player travel to Saturn's moon, Titan.  *Id.* at 23:37- 26:48.  On Titan, the player must defeat a

colony of arthropod-like aliens called "Hive" to restore power to the station where the Guardians

have gathered.  *Id.* at 30:31-32:51, 34:09-37:00.  With power restored, the Guardians decrypt

intercepted Cabal messages and learn that the Almighty is aimed at the Sun.  *Id.* at 55:38-57:48.

Commander Zavala plans for the Guardians to attack the Almighty, and tasks the player with finding two other Guardian commanders, Cayde-6 and Ikora Rey. *Id.* at 57:52-58:58. The player first travels to a planetoid called Nessus in search of Cayde-6, only to find that the Vex, a hostile cyber-organic species, has trapped Cayde-6 in a teleportation loop. *Id.* at 1:00:02-9:50. Among the remains of a crashed spaceship, the player meets the ship's AI operator, Failsafe, who helps the player rescue Cayde-6. *Id.* The player then travels to Jupiter's moon Io and easily locates Ikora Rey, who sends the player to fight through warped, corrupted entities known as the Taken, to find an interplanetary defense system called a Warmind. *Id.* at 1:52:02-59. The Warmind reveals that the Almighty cannot be destroyed without also destroying the Sun. *Id.*

The Guardians reconvene and decide that the player must shut down the Almighty's weapon, rather than destroy it outright. *Id.* at 1:56:19-58:54. To achieve this, the player invades a Cabal base on the outskirts of the Last City, fights through Red Legion warriors, boards a Cabal carrier, kills an elite member of Ghaul's Blood Guard, and steals a spaceship. *Id.* at 2:00:53-5:18. The player then boards the Almighty and destroys its cooling mechanisms, overheating and shutting down its weapon systems. *Id.* at 2:05:27-9:00. With the Almighty is disabled, the Consul urges Ghaul to take the Light by force. Enraged, Ghaul kills the Consul. *Id.* at 2:12:25-15:28.

Back on Earth, the player fights Red Legion warriors through the streets and rooftops of the Last City and is teleported to Ghaul's command ship. *Id.* at 2:15:35-18:31. The player makes their way to the ship deck, where it is revealed that Ghaul has finally taken the Light by force. *Id.* at 2:18:33-24:13. A difficult final battle ensues, wherein Ghaul rises as a massive, godlike avatar. *Id.* In response to Ghaul's hubris, the Traveler releases a wave of Light that destroys its cage, kills Ghaul, decimates the Red Legion, and restores the Light. *Id.* Earth and the Last City are saved.

## III.    <u>LEGAL STANDARD ON A MOTION TO DISMISS</u>

Rule 12(b)(6) exists to weed out facially implausible claims and cases from the Court's docket.  *See Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008).  To state a proper cause of action, "a plaintiff must plead specific facts, not mere conclusory allegations." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Complaints require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and will fail if they only make "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing and quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  It is Martineau's burden to set forth sufficient facts that, if accepted as true, would suggest he is entitled to relief.  *Twombly,* 550 U.S. at 556.

"Complaints alleging copyright infringement are no exception to this rule and can be decided as a matter of law."  *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 787 (S.D. Tex. 2009), *summarily aff'd* 381 F. App'x 449 (5th Cir. 2010).  On a motion to dismiss, courts may consider the facts alleged in the complaint and any documents incorporated by reference, including the parties' works.  *See id*. (citing *Collins*, 224 F.3d at 498-99).  The Court thus may properly consider the asserted and accused works for the purposes of this Motion, despite Martineau's decision not to attach them to his pleading, as they are central to Martineau's claims and heavily referenced in his Complaint.  *See id*.  Bungie attaches Martineau's *The Red Legion*, provided to Bungie's counsel by Plaintiff's counsel, and comprehensive, relevant video footage from *Destiny 2* depicting the accused elements.  *See* Exs. A-C; Dkt. 1 ¶¶ 8(a), 159; *see also* Decl. ¶¶ 7-9.

## IV.    <u>ARGUMENT</u>

For Martineau to establish copyright infringement, he must "prove that: (1) he owns a valid copyright and (2) [Bungie] copied constituent elements of [his] work that are original."  *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004).  To establish the

second element, Martineau must prove (1) factual copying; and (2) substantial similarity (sometimes referred to collectively as "actionable copying").  *Id.; see also Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007).  While Martineau alleges ownership of a 2023 copyright registration (Dkt. 1 ¶ 13), he has not pled (and indeed, cannot plead) facts establishing that Bungie factually copied *The Red Legion*, nor that the works are substantially similar.  As set forth below, Martineau's Complaint should be dismissed with prejudice because of these failures.  His prayer for statutory damages and attorneys' fees also fails under 17 U.S.C. § 412 because the alleged infringement antedates his work's copyright registration by six years.

### A.    Martineau Cannot Establish Factual Copying

"Factual copying[] can be proved by direct or circumstantial evidence."  *Armour*, 512 F.3d at 152.  Because he does not allege direct evidence of copying, Martineau must plausibly allege that Bungie "had access to the copyrighted work before creation of the infringing work and [] the works contain similarities that are probative of copying."  *Id.* (citing *Positive Black Talk, Inc.*, 394 F.3d at 367-68) (noting that direct evidence of copying is "rarely available"); *Busti v. Platinum Studios, Inc.*, 2013 WL 12121116, at *3 (W.D. Tex. Aug. 30, 2013).  Absent a sufficient allegation of prior access, Martineau instead must show "such a 'striking similarity' between the two works that the similarity could only be explained by actual copying."  *Id.* at 152 n.3; *see also Busti*, 2013 WL 12121116, at *3.  Martineau cannot show either form of factual copying and any attempt to rectify this deficiency would be futile.

### 1.    Martineau Has Not Sufficiently Pled Bungie's Prior Access

To plausibly allege access, Martineau must show Bungie "had a reasonable opportunity to view [his] copyrighted work" before creating *Destiny 2*.  *Armour*, 512 F.3d at 152-53.  "[S]uch a reasonable opportunity to view must be plausible and cannot be grounded in speculation."  *Atkinson v. Netflix, Inc.*, 2022 WL 2899275, at *4 (E.D. Tex. May 18, 2022) (citing *Twombly*, 550

U.S. at 555).  "'[C]ourts have consistently refused to treat internet publication alone as sufficient to [show access].'"  *Id.* at *6 (quoting *Cain v. Hallmark Cards, Inc.*, 2016 WL 3189231, at *5 (M.D. La. June 6, 2016)).

Martineau fails to allege any facts showing Bungie had a "reasonable opportunity to view" his work prior to creating *Destiny 2*.  His only access allegation is that he published his work on the internet via the publicly accessible, keyword-searchable blogging platform WordPress.  *See* Dkt. 1 at ¶¶ 15-16.  But the mere presence of Martineau's work on the internet is alone insufficient, and Martineau "has not provided any conceptual link, or a chain of inferences to plausibly establish access."  *See Atkinson*, 2022 WL 2899275, at *6, 13.  To the extent Martineau claims his allegations somehow assume Bungie accessed Martineau's writings by running keyword searches, that would be impermissible "speculation or conjecture."[3]  Dkt. 1 at ¶ 16; *see Armour*, 512 F.3d at 153 ("Reasoning that amounts to nothing more than a 'tortuous chain of hypothetical transmittals' is insufficient to infer access").  Thus, that Bungie *could have* conducted searches on WordPress and thereby accessed Martineau's work is insufficient to plead access and, in turn, factual copying. *See Atkinson*, 2022 WL 2899275, at *4 ("It is pure speculation that [Defendant] would inevitably have seen the copyrighted works . . . through fervent searching").

### 2.    Martineau Has Not Sufficiently Pled Similarities Probative of Copying

Because Martineau fails to sufficiently allege Bungie's prior access to his work, *see supra* at Section IV(A)(i), his claim can only survive "if the two works are 'so *strikingly* similar' as to preclude the possibility of [Bungie's] independent creation."  *Busti*, 2013 WL 12121116, at *3. (emphasis in original).  Striking similarity is a high bar and cannot be met with "a few shared plot

---

[3] In addition to its impermissibly speculative nature, such an implication also creates a factual paradox: if Bungie hypothetically accessed Martineau's work by searching WordPress for "the red legion" and thereby discovered Martineau's blog and writings, it could not have copied the concept of its own Red Legion from Martineau.

points" and "supposedly overlapping scenes." *See Atkinson*, 2022 WL 2899275, at *7 (dismissing for lack of striking similarity where accused scenes "[were] not virtually indistinguishable"); *Vallery v. Am. Girl Dolls*, 2015 WL 1539253, at *3 (E.D. La. Apr. 6, 2015) ("The test for 'striking similarity' is 'stringent' . . . [and] 'the mere existence of multiple similar characteristics is not enough.'"). Courts have declined to find striking similarity where similarities are derived from a "common genre that both [works] share" and where "there are differences . . . that prevent[] the Court from concluding that the only possible explanation for their similarity is copying." *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 2014 WL 6982331, at *5 (S.D. Tex. Dec. 9, 2014).

Martineau's collection of writings is nonlinear, challenging to parse, and bears few similarities to his own summary in the Complaint, let alone to the narrative of *Destiny 2*. Only through the Complaint's self-serving summaries and generous post-hoc reorganization of constituent narrative pieces does Martineau's asserted expression take a form sufficiently linear to be capable of being discussed in his pleading and, in turn, this Motion. But the Court must make the infringement assessment by examining the works themselves, and "[t]he requisite similarity may not be shown by an analysis that alters the actual sequence or construction of plaintiff's work in order to achieve a juxtaposition that makes for greater similarity with defendant's work." 4 NIMMER ON COPYRIGHT § 13D.06 (2024). Thus, when assessing striking similarity, the Court must compare *The Red Legion* against *Destiny 2* alone*, and not by the descriptions in the Complaint.

Under this proper lens, *The Red Legion* and *Destiny 2* are not similar, much less strikingly so. *The Red Legion* is a disjointed collection of sparse, asynchronous prose and poetry full of obscure and invented language, presented in an avant-garde structure and style that make it difficult, if not impossible, for a reader to discern an overarching narrative (if indeed there is one). The reader is presented with a series of seemingly unrelated and out-of-order tableaux featuring

11

inconsistently represented and under-developed characters and objects—some more prominent but still elusive like Yinnerah, Xionbur, Sinestria, and "atonizers"; and some more ephemeral like the amorphous and titular "Red Legion," unnamed conscripts, legionnaires, engineers, specimens, and "miogas"—which, even when contrivedly (and improperly) recast and rearranged for the purposes of his pleading, do not add up to a coherent, cognizable story remotely similar to *Destiny 2*.  In fact, *The Red Legion* omits any conclusion of Yinnerah's much-discussed invasion of Earth and glosses over what ought to be key points in the alleged plot—the actual invasion, human resistance, Yinnerah's triumph, etc.  The main perspective of *The Red Legion* is of those aligned with Yinnerah and his invading forces, rather than those resisting his invasion.

In stark contrast, *Destiny 2* is a narrative-rich, interactive, internet-based 3D audiovisual work with a cast of distinct and well-developed characters who chatter constantly about the player's objectives and their opinions on how best to achieve them, expressing personalities, fears, motivations, and complex interpersonal relationships in the process.  The narrative of each campaign proceeds fluidly and chronologically—necessarily so, as players must easily understand their objectives and the overarching plot in order to enjoy and engage with the game.  *Destiny 2* is also contextualized within the vast and complex lore of the earlier-established *Destiny* universe and franchise, *i.e.*, it exists within an ongoing intergalactic battle between primordial forces of good (the Light) and evil (the Darkness).  Accordingly, *Destiny 2* is presented from the vantage point of a Guardian, tasked with protecting humanity, the Last City, and the Traveler, rather than aiding and abetting the alien invaders like most of *The Red Legion* characters and narrators.

Moreover, "[e]lements of similarity that are so common that they might indeed have been independently created by both plaintiff and defendant are not probative of factual copying," and must be disregarded at the Rule 12 stage.  NIMMER ON COPYRIGHT § 13D.06 (2024).  As discussed

in further detail below, *see infra* at Section IV(B), nearly all Martineau's asserted elements—the invasion of Earth, brutal alien overlords, planet-killing superweapons, malfunctioning spaceship reactors, interstellar communications, consciousness transfer, *inter alia*—are unprotectable common themes, characters, and technologies that have appeared throughout the sci-fi genre for over a century, and are original to neither *The Red Legion* nor *Destiny 2*. Indeed, many of these elements appear in the earlier *Destiny* game, which antedates Martineau's asserted work.

*The Red Legion* and *Destiny 2* are not sufficiently—and certainly not strikingly—similar so as to permit the necessary plausible inference of factual copying, especially in the absence of any plausible allegation that Bungie had prior access to Martineau's work. Dismissal of Martineau's claim with prejudice on this basis alone is warranted, as no further improper recasting of these fundamentally dissimilar works can rescue his claim. *See Vallery v. Am. Girl, L.L.C.*, 697 F. App'x 821, 825 (5th Cir. 2017) (affirming denial of motion to amend complaint on the basis of futility where "[t]he two works do not bear such striking similarity that copying may be inferred.").

### B.    The Works Are Not Substantially Similar

Even assuming *arguendo* that Martineau has sufficiently pled factual copying (he has not), his claim still fails because (1) all alleged infringing elements are unprotectable stock themes (*i.e.*, *scènes à faire*) ubiquitous to the genre, or otherwise unprotectable ideas, and (2) the only similarities between the works are unprotectable elements differing drastically in their expression.

### 1.    Unprotectable Element Filtration

To assess substantial similarity, the Court must view *The Red Legion* and *Destiny 2* side-by-side and determine whether, from the perspective of a layperson or "ordinary observer," there exists substantial similarity between the works' *protectable* elements. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 550 (5th Cir. 2015) (citations omitted). Before the Court may assess substantial similarity, however, it must first identify and "filter" out any unprotectable

elements of Martineau's work to ascertain whether *Destiny 2* infringed any protectable elements. *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533-34 (5th Cir. 1994); *see also Nola Spice*, 783 F.3d at 551 & n.6 (filtering out unprotectable elements as first step of analysis).

### i.    *Scènes à Faire and Unprotectable Ideas*

During filtration, the Court must separate out unprotectable "*scènes à faire,* i.e., expressions that are standard, stock or common to a particular subject matter." *Busti*, 2013 WL 12121116, at *6 (quoting *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1344 (5th Cir. 1994)).  This includes features that, although claimed by Martineau, are in actuality "theme[s] or trope[s] that [have] long existed" or "[m]aterial or themes commonly repeated in a certain genre." *Rucker v. Harlequin Enters., Ltd*., 2013 WL 707922, at *7 (S.D. Tex. Feb. 26, 2013).  It also includes claims over elements that are "familiar and widely used," "classic plot feature[s] in works of fantasy and science fiction," and those which "flow[] naturally from the general concept of [a science fiction] world." *See Busti*, 2013 WL 12121116, at *6 (finding that, for example, "aliens . . . on a descending ramp from their respective flying saucers" is a "common, stock scene for works involving aliens, and as such it is unprotectable").  The Court can determine whether an element is *scène à faire* at the pleading stage, without the need to reference any discovery.  *See id.* (identifying science fiction *scènes à faire* at the pleading stage); *Abdin v. CBS Broad., Inc.*, 405 F. Supp. 3d 591, 597-99 (S.D.N.Y. 2019) (same and dismissing complaint where works were not substantially similar as a matter of law); *Basile v. Sony Pictures Ent. Inc*., 2014 WL 12521344, at *5 (C.D. Cal. Aug. 19, 2014), *aff'd*, 678 F. App'x 473 (9th Cir. 2017) (same).

Most elements Martineau claims ownership over and copying of are unprotectable *scènes à faire* within the genre of science fiction and cannot be considered when analyzing substantial similarity between *The Red Legion* and *Destiny 2*.  *See Randolph*, 634 F. Supp. 2d at 789.  For example, as evidence of purported similarity, Martineau points to the fact that "spaceships are used

at similar points in the narratives," that "beacons [are used] as devices for receiving messages," that "encrypted messages are transmitted through beacons . . . [and] must be deciphered," and that both stories feature "extremely powerful weapons that can bring about the destruction of an entire race" and alien "surveillance of Earth."  Dkt. 1 at ¶¶ 69, 93, 107, 118, 126.  But these sort of sci-fi themes and tropes have been specifically held unprotectable *scènes à faire*.  For example, in *Busti*, the court found that "depiction of the aliens first appearing on a descending ramp from their respective flying saucers" and flying saucers "overhead" are examples of unprotectable *scènes à faire. See Busti,* 2013 WL 12121116, at *1, 6.  The Second Circuit has likewise held that sci-fi "typically involves 'stock themes,' such as space travel, supernatural forces, war games, alien discovery, and adventuring through space," and that "copyright . . . does not protect generic themes and storylines involving aliens or advanced technology."  *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 71 (2d Cir. 2020).  Similarly, "spaceships landing, going on missions, military involvement, [and] central character deaths [are] vague elements and 'scenes-a-faire' of science fiction works." *Basile v. Los Angeles Film Sch., LLC*, 2019 WL 5377126, at *9 (C.D. Cal. Sept. 30, 2019); *see also Mego Corp v. Mattel, Inc.*, 1978 WL 21347, at *2 (S.D.N.Y. Sept. 29, 1978) ("The popularity of the theme of spaceships and space warriors and related subjects is well-known and the success of the motion picture *Star Wars* [and] *Star Trek* and other such vehicles is something that this Court can judicially note.").  Martineau's untenable claims of ownership over the concept of alien invasions, threatened destruction of Earth, communication beacons sending encrypted messages across space, spaceship transportation/combat, laser-based superweapons, robots with human consciousnesses, sentient AI, and any other elements ubiquitous within the genre must fail as a matter of law.[4]

---

[4] These elements are so ubiquitous within sci-fi that they were already present and developed in the first *Destiny* game, to which Martineau asserts no claim of infringement (likely because it antedates his asserted work).

Martineau also pleads himself out of Court as to many of the elements asserted in his Complaint by ignoring the idea-expression dichotomy, under which only expression, rather than mere ideas or concepts, are protected. *See Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 241 F.3d 398, 414 (5th Cir. 2001) ("[C]opyright protects the expression of ideas, not the ideas themselves.") (*citing Kepner-Tregoe*, 12 F.3d at 533). Martineau asserts ownership over and copying of mere ideas including "narrative elements involving [a space]ship reactor," "[t]hematic elements of a valuable entity floating above Earth," an "impending apocalyptic theme," and the "theme of a dedicated mission involving a spaceship." *Id.* at ¶¶ 137, 141, 145, 148. Indeed, Martineau's use of conceptual words like "narrative element," "theme," and "thematic element" throughout his Complaint betrays the unprotectable nature of the asserted features. *See Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458, 1463 (5th Cir.1990) (noting that the expression of ideas is protected, but not the ideas themselves). By definition, these are mere unprotectable ideas. *See, e.g.*, Dkt. 1 at ¶¶ 30 ("Martineau's work introduces the *concept* of transversion technology, which allows individuals to merge minds and consciousness into different beings across different timelines") (emphasis added); 72 ("Both works focus on *concepts* relating to consciousness transfer and ethical dilemmas surrounding it.") (emphasis added); 96 (characterizing "a militaristic faction . . . monitoring beings on Earth for an extended period, withholding direct contact while observing their behavior and connections," as a "unique *narrative element* that gives rise to a sense of omnipresent danger and suspense," and accusing Destiny 2 of employing "an almost identical *narrative device* . . . .") (emphases added); 99 ("The identical *element* of animal-like creatures . . . .") (emphasis added); 105 ("The similarity between the miogas in Martineau's work and the war beasts in Destiny 2, shows that the creators of Destiny 2 copied Martineau's work, and continue to use this *concept* of the miogas directly in their game.")

16

(emphasis added) (*see also* Decl. ¶ 13, Ex. F); 118-119 (characterizing "the use of beacons as devices for receiving messages, particularly messages pertaining to the Red Legion," as a "*concept present throughout Martineau's work . . . .*") (emphasis added); 122-123 ("In Martineau's work, a recurring *theme* is the use of beacons to receive and interpret transmissions pertaining to the Red Legion and its activities . . . . This concept is evident [in two of the writings within *The Red Legion* collection] where the transmissions often conclude with a clear note.") (emphasis added); 135-137 (characterizing "an engineer grappling with difficulties concerning a ship's reactor, implying potential destruction and a threat to the ship and beyond," as a "*theme* [that] shows striking parallels to the plot in Destiny 2" and alleging "[t]he *narrative elements* involving ship reactor complications and the resulting consequences in Destiny 2 copy *themes and scenarios* present in Martineau's work") (emphases added); 143-145 ("In Martineau's work, the looming threat of an apocalyptic event is a central *theme* . . . . Similarly, in Destiny 2, the *theme* of apocalypse is central to its narrative . . . . The shared impending apocalyptic *theme* represents a prominent *narrative device* in both works" (emphases added); 148 ("This *theme* of a dedicated mission involving a spaceship is closely mirrored in Destiny 2 . . . .") (emphasis added); 149-150 ("In Martineau's work, the concept of consciousness transfer is a significant *theme*. . . . This *concept represents a technological or metaphysical process* . . . . In Martineau's work, the concept of consciousness transfer, known as 'transversions', [sic] is a significant *theme*. This *process* involves . . . .") (emphases added). If such themes and concepts amounted to protectable expression, Martineau's own work would be an infringement of the thousands of sci-fi works that preceded *The Red Legion*.

Even where Martineau doesn't explicitly undermine his claims with language violative of the idea-expression dichotomy, the thrust of his allegations does. For example, when comparing his "atonizer prototype" to *Destiny 2*'s "the Almighty," Martineau reveals that the only similarities

between the two are conceptual: "Both the atonizer prototype and the Almighty *are portrayed as extremely powerful weapons that can bring about the destruction of an entire race*. . . . these weapons are *linked to an antagonistic force . . . to dominate and destroy Earth. . . . Use of these weapons . . . in both works leads to a call for help and resistance*." *Id.* at ¶¶ 107-110 (emphases added). Martineau's allegations concerning the other species of "atonizer" in his work, the confusingly named "heationo flame atonizer," are also grounded in an improper claim of ownership over the unprotectable concept of "flame-based weaponry." *Id.* at ¶ 112. In a final climactic coup-de-grace, Martineau baldly alleges that both works deal with (the extremely generic theme of) "violence within the Red Legion." *Id.* at ¶¶ 155-157. None of these themes, concepts, elements, devices, or *ideas* is protectable and may be exclusively "owned" by Martineau.

## ii.    *Indistinctly and Superficially Expressed Elements*

Moreover, the Court must filter out any elements expressed without sufficient detail to distinguish them from the generalized unprotectable concepts from which they derive. Again, because copyright law protects only the *expression* of ideas and not the ideas themselves, "[t]he more a work is general and lacking in detail, the more likely the remaining ideas are to be broad, common, and unprotectable." *Rucker*, 2013 WL 707922, at *17 (citing *Kern River Gas Transmission Co.*, 899 F.2d at 1463). Courts have held that copyright infringement claims must fail when "the similar parts of the parties' works are unprotectible . . . trivial, scattered details." *Williams v. Crichton*, 84 F.3d 581, 590-91 (2d Cir. 1996) (citation omitted). The same is true of characters that Martineau insufficiently expresses. *See id.* at 589; *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly"). Courts have found "indistinct stock characters do[] not warrant copyright protection" where, for example,

18

"[n]one . . . is discussed on more than one page of the work, and the characters' personality traits are undeveloped." *Lewinson v. Henry Holt & Co.*, 659 F. Supp. 2d 547, 574 (S.D.N.Y. 2009).

Martineau has obviously cherry-picked a litany of purported similarities, often mischaracterizing the works to force apples to look like oranges.[5]  Most egregiously, Martineau lays broad claim to many narrative elements, themes, and characters that are only superficially mentioned in his asserted work.  For example, Martineau's entire 115-page work makes a singular reference to "Tononob Station," noting merely that it is an "elevated city that houses a human engineered species," that it "float[s] above what you would refer to as India," and that "Yinnerah wishes to take [it]."  *See* Ex. A at 29; *see also* Dkt. 1 at ¶¶ 138-141.  Similarly, there is only one reference to aliens surveilling or monitoring Earth.  *See* Ex. A at 7 ("We still monitor the ZT920 and ZT930a beings on planets 34-Bc (Earth) and 35-BC (Gala-Tar)."); *see also* Dkt. 1 at ¶¶ 92-97.  Likewise, there is but one reference to a spaceship's reactor ("[T]he ship's reactor rejects all changes to [translation error] eionboe oeiwbuiou bohein oiobbe . . .") and one express reference to message decryption ("Decrypt and authorize for personal recording.").  *See* Ex. A at 23, *see also* Dkt. 1 at ¶¶ 125-28; 134-37.  The same is also true of Martineau's asserted "'fail' safe" feature of the "atonizer prototype" (Ex. A at 18) and "The Red Fox" (Ex. A at 20), which are each referred to only once each in all 115 pages of *The Red Legion*, and introduced with either minimal explanation (*e.g.*, "'fail' safe" (Ex. A at 18) ("There is a 'fail' safe on the digital input panel — it will reverse all effects of the enhancement beam — and permanently alter the physics of the surrounding locale for approximately 4 mega-secs")) or none at all (*e.g.*, "the Red Fox" (Ex. A at

---

[5] For example, Martineau alleges that the cyborg-esque "Exomind" characters of *Destiny 2* (*see supra* at 5), are created by "transferring human consciousness into robotic bodies through 'Transversive Steps' . . . closely mirroring the concept of 'transversion' in Martineau's work."  Dkt. 1 at ¶ 151.  But "Transversive Steps" is merely the name of a pair of rare, armored boots that *Destiny 2* players may equip to increase their character's running speed.  *See* Decl. ¶ 11, Ex. D.  "Transversive Steps" boots have no relation to the *Destiny 2* "Exominds," *see id.* ¶ 14, Ex. G, or transferring human consciousness into robotic bodies, and these boots have seemingly been referenced merely so that Martineau may artificially inflate the perceived similarity between the parties' works.

20) ("The Red Fox has set out to obtain the Dr. specifically assigned to the prototype atonizer.").

None of these elements is expressed with any degree of detail to make them indistinguishable from

the "broad, common, and unprotectable" ideas from which they derive.

Such trivial, scattered references lack cognizable expression and are therefore too general

to be protectable.  *See Rucker*, 2013 WL 707922, at *17.  To the extent Martineau's stylistic

choices—namely, fragmented short epistolary prose and simplistic lyrical verse—excluded the

very expressive detail necessary for copyright protection over the claimed elements, that is "the

penalty [Martineau] must bear for marking them too indistinctly."  *Nichols*, 45 F.2d at 121.

### iii.    Unprotectable Characters

"Characters are not ordinarily entitled to copyright protection." *Blizzard Entm't, Inc. v.*

*Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1173 (N.D. Cal. 2015) (citing *Rice v. Fox*

*Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003)).  They may be protected only when "'sufficiently

delineated' and displaying 'consistent, widely identifiable traits'" such that they may be deemed

"especially distinctive." *DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015) (citations

omitted).  Martineau's characters lack the detail needed to be distinctive and protectable.

Martineau's Complaint centers on the chief antagonist, Yinnerah, who is described as a

powerful, conquering alien overlord with his sights set on Earth.  *See* Dkt. 1 at ¶¶ 20-23.  Yinnerah

thus "acts as a classic villain" of science fiction, and "appears only as an anonymous figurehead

intent upon achieving his aim."  *See Wooten v. Netflix, Inc.*, 2021 WL 4864744, at *5-6 (N.D. Ga.

May 25, 2021).  Martineau never explains what Yinnerah looks like or sounds like, nor does he

develop Yinnerah's personality beyond the villainous clichés of power-hungry ambition and

senseless brutality.  *See, e.g.*, Ex. A at 30, 49, 108.  Absent further creative development and detail,

a rudimentary villain like Yinnerah cannot be protected.  *See Allen v. Scholastic Inc.,* 739 F. Supp.

2d 642, 660-61 (S.D.N.Y. 2011) (character unprotectable where author provided "only a few

details about [the character], such as where he lives and what he does, but [did] not imbue him with a discernible personality or distinguishable appearance.").  Indeed, Yinnerah himself "speaks" only three times throughout *The Red Legion*, and merely to deliver threats and boast about his power.  *See* Ex. A at 4-5, 25, 30-32.  Yinnerah thus acts as a prototypical alien overlord throughout *The Red Legion*.  Indeed, Yinnerah's "superficiality underscores that his character is but a 'rough idea[] of general nature . . . instead of [a] specific expression and realization of those ideas.'"  *Allen*, 739 F. Supp. 2d at 660-61.  Yet despite his sparse treatment and one-dimensionality, Yinnerah is nonetheless Martineau's most developed character.  Therefore, *none* of Martineau's characters is distinctive enough to be protectable.  *See id.* at 661 n.5.

    iv. <u>*"The Red Legion" Title and Other Short Phrases are Unprotectable*</u>

   Finally, it is axiomatic that mere words, short phrases, and character names do not merit copyright protection.  *See DuBay v. King*, 844 F. App'x 257, 265 (11th Cir. 2021) (citation omitted).  Thus, the Court should also filter from the substantial similarity analysis Martineau's claim over names and words, including "The Red Legion" (referring, in both works, to a military legion styled after the ancient Roman tradition), "legionaries/legionnaires" (referring in both works to combatants organized within a legion), "The Red Fox" (referring to a spaceship in Martineau's work, and compared to the "Skulking Fox," one of more than 400 named spaceships in *Destiny 2* (Decl. ¶ 12, Ex. E)), and "fail safe" (referring to a conventional fail safe in Martineau's work, but referring to non-player character "Failsafe" in *Destiny 2* (*id.* ¶ 15, Ex. H)).  Like each accused element, the expression of these also lacks sufficient detail to be protectable.  *Nichols*, 45 F.2d at 121.

   Because names, titles, stock characters, and *scènes à faire* are "freely available for authors and creators to use in their creative works," the Court should not consider Martineau's claims over these in its substantial similarity analysis.  *See Randolph*, 634 F. Supp. 2d at 789.

C.    **The Works as a Whole are Not Substantially Similar**

Even assuming *arguendo* that any of Martineau's asserted expression is protectable—it is not—the only similarities the works share are in their use of generalized, unprotectable elements common to the sci-fi and space fantasy genres, and identifiably similar only when "extracted from their context, placed side-by-side, and framed with well-chosen comparative language, as [Martineau's] counsel has skillfully done." *See Busti*, 2013 WL 12121116, at *5. But neither the parties nor the Court may rely on summaries and lists of purported similarities. *See Randolph,* 634 F. Supp. 2d at 792 (explaining that the similarity analysis is "a comparison properly made without the plaintiff's aid or suggestions") (internal quote omitted); *see also Williams*, 84 F.3d at 590 (lists of specific instances of similarity prepared by an author alleging infringement are "'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works' and "[s]uch a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another.") (int. citations omitted)). In comparing the works side-by-side, the Court must look at the works in their entirety, *see Vallery*, 2015 WL 1539253, at *3, and will find them facially dissimilar to the ordinary observer in nearly every way.

Whereas Martineau's work is a text-based avant-garde alien invasion story presented non-linearly through a mix of fragmented prose and abstract verse, *Destiny 2* is a massive, multiplayer online mythic space fantasy roleplaying videogame that involves dozens of interactive campaigns filled with 3D gameplay and cinematic cutscenes about a multitude of subjects. The overall look and feel of both works are also markedly different—Martineau's writings are sparse, tonally bleak, non-linear, and difficult to parse, while *Destiny 2* is a lush, vivid, auspicious, and cohesive audiovisual work that carries players through a series of narrative-rich campaigns. *See Busti*, 2013

WL 12121116, at *5 (finding that a "work as a whole [was] in fact strikingly different, rather than similar" where it employed different visual aspects, tones, feels, and themes).

To the extent any plot or narrative can be gleaned from Martineau's work, it is clearly not substantially similar to *Destiny 2* or any of its campaigns, including the "Red War."  Through fleeting glimpses of narrative action and experimental verse, Martineau's *The Red Legion* centers on Yinnerah, an alien overlord who may have once helped create Earth, but also seeks to conquer it with his alien forces.  While *The Red Legion* never confirms if Yinnerah succeeds, it waxes from various perspectives about Yinnerah's rise from court jester to overlord, and his might, cruelty, and godlike power (which is only alluded to, but never demonstrated directly).

In *Destiny 2*'s "Red War" campaign, Ghaul seeks to obtain the power of the Light from the sentient, celestial orb known as the Traveler, which protects the Last City on Earth.  To do that, he must convince the Traveler that he is worthy of the Light, or attempt to take the Light by force. After he obtains the Light, Ghaul intends to use the Almighty to destroy the entire Solar System, including Earth.  The "Red War" plot primarily unfolds from the vantage point of a Guardian player seeking to foil Ghaul's plans.  In contrast, it appears—and Martineau conclusorily alleges— that Yinnerah's initial goal is to subjugate humanity and to be feared and worshipped like a god— a recurring theme that Martineau explores only indirectly through several odes referencing deities. *See, e.g.*, Ex. A at 32, 42, 84.  Tellingly, a single, off-hand reference to Yinnerah's desire to capture a floating city station cannot align the central goals of Ghaul with those of Yinnerah merely because the objects of their interests float in space above Earth.

In light of the obvious differences in feel, tone, plot, narrative structure, dialogue, character development, and medium, the Court should find "that no reasonable jury could find that the two works are substantially similar," or that any similarities "pertain only to unprotected elements of

the plaintiff's work." *Buckman v. Citicorp*, 1996 WL 34158, at \*3 (S.D.N.Y. Jan. 30, 1996) (granting Rule 12(b)(6) motion). Further, the Court should find that any attempt to amend would be futile, as side-by-side comparison establishes that the works are neither strikingly similar as a matter of factual copying, nor substantially similar as a matter of actionable copying.

### D.    Martineau is Not Entitled to Statutory Damages or Attorneys' Fees

Martineau requests an award of statutory damages and attorneys' fees. Dkt. 1 at ¶ 52. But to recover statutory damages, he must have registered his work *prior* to the alleged infringement, which he did not do. *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261 (5th Cir. 2020) (citing 17 U.S.C. § 412) (emphasis added). Martineau's Complaint incorporates by reference his copyright registration for *The Red Legion*, which was registered on November 11, 2023. *See* Dkt. 1 at ¶ 13; Ex. C; *see also Randolph*, 634 F. Supp. 2d at 787. Martineau's Complaint concedes that *Destiny 2* was released on September 6, 2017, *i.e.*, more than six years *before* Martineau registered his copyright in *The Red Legion*. *Id.* at ¶ 43. Thus, Martineau's failure to timely register bars his claims for statutory damages and attorneys' fees. 17 U.S.C. § 412.

### E.    Bungie is Entitled to Its Attorneys' Fees & Costs

In the Fifth Circuit, "an award of attorney's fees to the prevailing party in a copyright action is the rule rather than the exception and should be awarded routinely." *Keck v. Mix Creative Learning Ctr., L.L.C.*, 116 F.4th 448, 458 (5th Cir. 2024) (quoting *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 588-89 (5th Cir. 2015)); 17 U.S.C. § 505. In determining whether to award Bungie its fees and costs under § 505, the Court should find Martineau's claims frivolous and/or objectively unreasonable for the reasons discussed above, as "the lack of similarity between the unsuccessful plaintiff's work and the allegedly infringing work are obvious." *See Randolph*, 634 F. Supp. 2d at 787, 794-96 (holding that claims were "if not frivolous . . . objectively unreasonable"

24

where plaintiff identified points of similarity that, "as a matter of settled law, are not copyrightable.") The objective unreasonableness of Martineau's claims should be given "substantial weight in determinations whether to award attorneys' fees." *Id.* (noting that "denial of such awards in *objectively unreasonable* cases also disserves the purposes of copyright law, by failing to protect the owners of valid copyrights").

## V.    CONCLUSION

For the foregoing reasons, Bungie respectfully requests that the Court dismiss Martineau's copyright infringement claim with prejudice and award Bungie its defense fees and costs.

Date: December 20, 2024             Respectfully submitted,

                                    IRWIN FRITCHIE URQUHART MOORE & DANIELS, LLC

                                    /s/ *Kelly E. Brilleaux*
                                    Kelly E. Brilleaux (#33030)
                                    Connor W. Peth (#39499)
                                    Irwin, Fritchie, Urquhart & Moore, LLC
                                    400 Poydras Street, Suite 2700
                                    New Orleans, Louisiana 70130
                                    Telephone: 504-310-2100
                                    Facsimile: 504-310-2101
                                    kbrilleaux@irwinllc.com
                                    cpeth@irwinllc.com

                                    **DLA PIPER LLP (US)**
                                    Tamar Y. Duvdevani (*pro hac vice forthcoming*)
                                    Jared Greenfield (*pro hac vice forthcoming*)
                                    1251 Avenue of The Americas, 27th Fl.
                                    New York, New York 10020
                                    Telephone: 212-335-4500
                                    Facsimile: 212-335-4501
                                    tamar.duvdevani@us.dlapiper.com
                                    jared.greenfield@us.dlapiper.com

                                    ***Counsel for Bungie, Inc.***

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 20th day of December 2024, I served a copy of the foregoing pleading on counsel for all parties to this proceeding via e-mail, facsimile, and/or mailing same by United States mail, properly addressed, and first-class postage paid.

*/S/ Kelly E. Brilleaux*