**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| MATTHEW KELSEY MARTINEAU, | CIVIL ACTION NO.: 2:24-cv-02387 |
| *Plaintiff*, | |
| | JUDGE SUSIE MORGAN |
| v. | |
| | MAGISTRATE JUDGE MICHAEL B. NORTH |
| BUNGIE, INC., a Delaware Corporation; DOES 1-10, inclusive, | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF BUNGIE, INC.'S MOTION TO DISMISS ALL COUNTS OF MARTINEAU'S FIRST AMENDED COMPLAINT

1

## <u>TABLE OF CONTENTS</u>

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.    Procedural background ............................................................................2

III.    FACTUAL BACKGROUND ...................................................................3

    A.    Brief Description of Martineau's Work ........................................3

    B.    Brief Description of the *Destiny* Franchise ..................................4

        1.    "The Red War" Campaign .................................................5

        2.    "Curse of Osiris" Campaign .............................................7

IV.    LEGAL STANDARD................................................................................8

V.    ARGUMENT ..........................................................................................8

    A.    Martineau Cannot Establish Factual Copying ............................9

        1.    Martineau Has Not Sufficiently Pled Bungie's Prior Access ....................9

        2.    Martineau Has Not Sufficiently Pled Similarities Probative of Copying...................11

    B.    The Works Are Not Substantially Similar .................................14

        1.    Unprotectable Element Filtration...................................14

            i.    Scènes à Faire and Unprotectable Ideas.........................14

            ii.    Indistinctly and Superficially Expressed Elements.......................17

            iii.    Unprotectable Characters...............................................20

            iv.    Titles, Names, and Other Short Phrases are Unprotectable ..........21

    C.    The Works as a Whole are Not Substantially Similar .................22

VI.    CONCLUSION.......................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdin v. CBS Broad., Inc.*,
   405 F. Supp. 3d 591 (S.D.N.Y. 2019)......................................................................15

*Abdin v. CBS Broad. Inc.*,
   971 F.3d 57 (2d Cir. 2020)....................................................................................16

*Allen v. Scholastic Inc.*,
   739 F. Supp. 2d 642 (S.D.N.Y. 2011)..............................................................20, 21

*Armour v. Knowles*,
   512 F.3d 147 (5th Cir. 2007) ...............................................................................9, 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................8, 12

*Atkinson v. Netflix, Inc.*,
   2022 WL 2899275 (E.D. Tex. May 18, 2022)....................................................10, 11

*Basile v. Los Angeles Film Sch., LLC*,
   2019 WL 5377126 (C.D. Cal. Sept. 30, 2019) .........................................................16

*Basile v. Sony Pictures Ent. Inc.*,
   2014 WL 12521344 (C.D. Cal. Aug. 19, 2014), *aff'd*, 678 F. App'x 473 (9th
   Cir. 2017) ...........................................................................................................15, 17

*Batiste v. Najm*,
   28 F. Supp. 3d 595 (E.D. La. 2014)....................................................................21, 22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................8, 10

*Benfer v. City of Baytown*,
   120 F.4th 1272 (5th Cir. 2024) ...............................................................................3, 4

*Blizzard Entm't, Inc. v. Lilith Games (Shanghai) Co.*,
   149 F. Supp. 3d 1167 (N.D. Cal. 2015) .....................................................................20

*Buckman v. Citicorp*,
   1996 WL 34158 (S.D.N.Y. Jan. 30, 1996) ...............................................................25

*Busti v. Platinum Studios, Inc.*,
   2013 WL 12121116 (W.D. Tex. Aug. 30, 2013)............................................... *passim*

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ........................................................................8

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) ...................................................................20

*DuBay v. King*,
844 F. App'x 257 (11th Cir. 2021) ..............................................................21

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
26 F.3d 1335 (5th Cir. 1994) .......................................................................14

*Ferrer v. Chevron Corp.*,
484 F.3d 776 (5th Cir. 2007) .......................................................................14

*Guzman v. Hacienda Recs. & Recording Studio, Inc.*,
2014 WL 6982331 (S.D. Tex. Dec. 9, 2014) .............................................11

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
12 F.3d 527 (5th Cir. 1994) ...................................................................14, 16

*Kern River Gas Transmission Co. v. Coastal Corp.*,
899 F.2d 1458 (5th Cir.1990) .................................................................17, 18

*Kiely v. Universal Music Grp.*,
2019 WL 9443183 (C.D. Cal. Dec. 12, 2019) .............................................4

*Lewinson v. Henry Holt & Co.*,
659 F. Supp. 2d 547 (S.D.N.Y. 2009)..........................................................18

*Mego Corp v. Mattel, Inc.*,
1978 WL 21347 (S.D.N.Y. Sept. 29, 1978)..................................................16

*Nichols v. Universal Pictures Corp.*,
45 F.2d 119 (2d Cir. 1930)...........................................................18, 19, 22

*Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*,
783 F.3d 527 (5th Cir. 2015) .......................................................................14

*Positive Black Talk, Inc. v. Cash Money Records, Inc.*,
394 F.3d 357 (5th Cir. 2004) .....................................................................8, 9

*Randolph v. Dimension Films*,
634 F. Supp. 2d 779 (S.D. Tex. 2009), *summarily aff'd* 381 F. App'x 449 (5th
Cir. 2010) .................................................................................8, 15, 22, 23

*Reliable Consultants, Inc. v. Earle*,
517 F.3d 738 (5th Cir. 2008) ........................................................................8

*Rice v. Fox Broad. Co.*,
　330 F.3d 1170 (9th Cir. 2003) ................................................................20

*Rucker v. Harlequin Enters., Ltd.*,
　2013 WL 707922 (S.D. Tex. Feb. 26, 2013) ..............................15, 17, 19

*Vallery v. Am. Girl Dolls*,
　2015 WL 1539253 (E.D. La. Apr. 6, 2015), *aff'd*, 697 F. App'x 821 (5th Cir.
　2017) ................................................................................................ *passim*

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
　241 F.3d 398 (5th Cir. 2001) ................................................................16

*Williams v. Crichton*,
　84 F.3d 581 (2d Cir. 1996)..............................................................18, 23

*Wooten v. Netflix, Inc.*,
　2021 WL 4864744 (N.D. Ga. May 25, 2021) .........................................20

**Other Authorities**

Fed. R. Civ. P. 12 ..........................................................................................13

Fed. R. Civ. P. 12(b)(6)........................................................................1, 8, 25

4 Nimmer on Copyright § 13D.06 (2024).............................................12, 13

Defendant Bungie, Inc. ("Bungie"), submits this Memorandum of Law in support of its motion to dismiss all counts of the First Amended Complaint (Dkt. 24) ("FAC") filed by Plaintiff Matthew Kelsey Martineau ("Martineau"), pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion").

## I.    PRELIMINARY STATEMENT

On March 10, 2025, this Court provided Martineau with clear instructions: any amended complaint he files "must address, fully and completely, all arguments raised in the Defendant's motion to dismiss." Dkt. 23 at 5. Through his FAC, Martineau tries, but fails, to follow those instructions by crafting additional "access" allegations, wordsmithing his summaries of his asserted work, *The Red Legion*, and his comparisons between it and Bungie's *Destiny 2*, and adding another supposedly infringing portion of *Destiny 2* to his claims. The FAC's superficial changes and additional conclusory/hypothetical allegations, however, do not rescue Martineau's baseless copyright infringement claims, and the reasons for dismissal set forth in Bungie's original motion also support dismissal of the amended pleading.

First, no amendment could change the fact that Martineau's description of *The Red Legion* in the FAC is irrelevant, given the Court's requirement to examine the works *themselves* to determine substantial similarity. Under that analysis —which the Court can and should do at this stage of the litigation—it is readily apparent that, as a matter of law, Bungie's "immersive and thrilling" 2017 video game *Destiny 2* is not substantially similar to *The Red Legion*, a disjointed collection of short experimental writings registered in 2023 as a collective work. *Destiny 2* is nothing like *The Red Legion*—the plot is different, the characters are different, and the expression of any supposedly overlapping themes or concepts is markedly different. Although Martineau again strains to draw similarities via self-serving summaries and post-hoc rearrangement of his nonlinear writings, every identified "similarity" is instead an archetypal example of an unprotectable idea, concept, or phrase, particularly within the sci-fi and space fantasy genres. The

1

Court's analysis should find that no substantial similarity exists with respect to any protectable elements, and, to quote *The Red Legion*, such a finding must "spell doom" for Martineau's FAC.

Second, Martineau's efforts to save his claim from dismissal by adding additional purely speculative, boilerplate, and conclusory allegations of access to the FAC likewise fails to pass muster. Still lacking any direct evidence of the alleged copying, Martineau attempts to sufficiently plead that (1) Bungie had access to Martineau's asserted work prior to creating *Destiny 2*—or that the works are "strikingly similar"—and (2) that there is a plausible showing of substantial similarity between the protectable elements of *The Red Legion* and the expansive, interactive 3D audiovisual adventure of *Destiny 2*. But Martineau's FAC fails to meet either mark. His access argument relies on impermissible, unsubstantiated speculation, and, given the obvious dissimilarity between *Destiny 2* and *The Red Legion* when compared side-by-side, Martineau does not (and indeed, cannot) plausibly allege probative similarity, much less the higher bar of striking similarity absent a sufficient showing of access. Thus, the FAC fails to set forth a colorable claim of copyright infringement. Accordingly, Bungie respectfully requests that the Court dismiss Martineau's FAC with prejudice, and grant Bungie its forthcoming motion for fees and costs.

## II.    PROCEDURAL BACKGROUND

Martineau filed this action on October 2, 2024. Dkt. 1. On December 20, 2024, Bungie moved to dismiss all counts of Martineau's Complaint. Dkt. 11. On March 10, 2025, the Court, *sua sponte*, granted Martineau leave to file an amended complaint, and expressly ordered that "any amended complaint Plaintiff files must address, fully and completely, all arguments raised in the Defendant's motion to dismiss." Dkt. 23 at 5. Martineau filed his First Amended Complaint on March 24, 2025, and, on March 25, 2025, the Court dismissed Bungie's pending motion to dismiss the original complaint without prejudice. Dkts. 24 and 25.

III.    **FACTUAL BACKGROUND**

    A.    **Brief Description of Martineau's Work[1]**

    Martineau's work, *The Red Legion*, is a 115-page collection of free verse poems, lyrical odes, and shortform epistolary sci-fi and space fantasy writings about a small cast of alien and human beings that inhabit a universe caught in the throes of unending conflict across the galaxies and millions of years. *See* Ex. A. Written under the *nom-de-plume* Caspar Cole, Martineau's work was published in a series of short blogposts in 2013 and 2014. *See id.*; FAC ¶ 14. *The Red Legion* is incorporated by reference into the FAC and has been placed before this Court as Ex. A for the purposes of this Motion. *See Benfer v. City of Baytown*, 120 F.4th 1272, 1279 n.2 (5th Cir. 2024).

    *The Red Legion* primarily focuses on Martineau's chief antagonist, the brutal alien warlord Yinnerah, and the military unit he commands—the titular "Red Legion." *See* Ex. A at 8; FAC ¶ 25. *The Red Legion*'s plot unfolds through a series of fragmented tableaux that portray non-chronological glimpses of Yinnerah's rise to power from humble origins, his brutality, and his plotted invasion of Earth with the aid of his Red Legion, armed with weaponry called "atonizers." *See* Ex. A at 4-5, 17-28 42-43, 49-50; FAC ¶¶ 22-28, 32. Yinnerah and his forces monitor Earth prior to the invasion and communicate telepathically across time and space via a process dubbed "transversion." *See* Ex. A at 4-5, 7-8; FAC ¶¶ 35-36, 135. Martineau's work alludes to a constant cycle of war millions of years before Yinnerah's conquest. *See* Ex. A at 52-53. Paradoxically, *The Red Legion* also mythologizes Yinnerah as a creator of Earth. *See id.* at 52-53, 61-62.

    Among *The Red Legion*'s momentary flashes of narrative action are scenes of Red Legion troops annihilating human settlements and each other in an act of mutiny, stranded legionnaires wrestling with their inevitable demise, a Red Legion engineer troubleshooting an issue with a

---

[1] Because the Court must examine the works themselves for its similarity determination, *see infra* at Section V(C), Bungie provides only brief descriptions to provide context to the Motion.

spaceship's reactor, erotic and homicidal encounters involving members of Yinnerah's court, and instances of "transversion" communication. *See, e.g.*, Ex. A at 9-10, 15-16, 23, 33-34, 66-68, 115; FAC ¶¶ 124(c), 152(a), 134(a), 190. Most of the tale is told through nonsequential "testaments" penned by Yinnerah's sycophant, Xionbur, in which he interweaves brief historical accounts involving Yinnerah and other characters (most of whom appear only once), alongside confessions, devotional praises, and prophesies of Yinnerah's might. *See* Ex. A at 37-39, 54-86, 89-109, 114; FAC ¶ 114. Other parts are told via messages and log entries, often incomplete. *See* Ex. A at 3-34, 73-74, 110, 115; FAC ¶¶ 31-36, 158-159, 162-163. And others are told through a mix of free verse, panegyrics, cryptic prophecies, and third-person narratives. *See* Ex. A at 1-2, 35-53, 87-88. Most of the work is abstract verse untethered to a linear plot.

### B.    Brief Description of the *Destiny* Franchise

Bungie is the video game company responsible for developing the *Destiny* game franchise, which comprises the original *Destiny* game (first released September 9, 2014) and *Destiny 2* (first released September 6, 2017). *See* Declaration of Tyson Green ("Decl.") ¶¶ 4-5; FAC ¶¶ 37, 39, 70. The FAC incorporates by reference the allegedly infringing work, *Destiny 2,* as well as its precursor game, *Destiny*.[2] Bungie places *Destiny 2* as a whole before the Court in the form of (1) a narrated video compilation of gameplay footage and cutscenes from both *Destiny* games and (2) videos depicting representative gameplay footage and all interspersed cinematic cutscenes from *Destiny 2*'s "Red War" and "Curse of Osiris" campaigns, which feature most of the allegedly infringing elements accused in the FAC. Decl. ¶¶ 7-15; Exs. B-C, F.

---

[2] *Benfer*, 120 F.4th at 1279 n.2. The first *Destiny* game is referenced at Dkt. 1 ¶¶ 32-33. Bungie notes its release date above for the Court's reference. *Cf. Kiely v. Universal Music Grp.*, 2019 WL 9443183, at *2 (C.D. Cal. Dec. 12, 2019) (judicially noticing webpages showing release date of works referenced in FAC).

Both *Destiny* games are set in the same post-dystopian, mythic sci-fi universe in which the remnants of humanity live in Earth's Last City, protected by the hovering presence of a huge, celestial white orb called the Traveler. Ex. B at 2:43:04-48:30. The Traveler is a source of Light, a mysterious, powerful force that can be wielded by the protectors of the Last City and the broader Solar System, known as the Guardians. *Id.* at 2:00:53-1:57. *Destiny* players are Guardians tasked with defending humanity from the encroaching threat of hostile alien races across various story campaigns, each with its own narrative arc, including the "Red War" campaign. Decl. ¶ 6.

Because both *Destiny* installments are set in the same universe, many narrative elements from the original 2014 *Destiny* game are present in *Destiny 2*. *Id.* For example, both games allow players to select one of three character "races": (1) Humans, (2) "Awoken," humanoids with glowing eyes and colorful skin, or (3) "Exos," cyborg-esque "Exomind" robots uploaded with human consciousnesses. *Id.* Both games also feature a variety of enemy alien species—including the imperialistic and lizard-like Cabal, who organize their powerful military into Roman-esque "legions"—and incorporate technology ubiquitous in sci-fi, including spaceships, beacons, message encryption, superweapons, and sentient AI characters. *See, e.g.*, *id.* at 1:07:56-13:07, 1:31:15-32:16, 1:44:30-48:30; 3:38:39-41:14, 4:08:10-9:38.

### 1.     "The Red War" Campaign

When Bungie released *Destiny 2* in September 2017, the original story campaign players faced was "The Red War." Decl. ¶ 7; Ex. C; *see also* Ex. B at 4:34:30-55:00. The main antagonist of the "Red War" campaign is the villainous Cabal leader, Dominus Ghaul. Ex. C at 9:47-11:20. Although born a runt, Ghaul grew in power under the tutelage of a disgraced Cabal scholar known as the Consul and eventually seized control. *Id.* at 1:53:51-56:07. Ghaul's rise to power was in part attributable to the Almighty—a massive spaceship armed with a devastating energy beam capable of collapsing stars into supernovas and destroying entire solar systems. *Id.* at 55:39-57:22.

5

The "Red War" campaign revolves around Ghaul's pursuit of the immortal, unstoppable power of the Traveler's Light, and opens with Ghaul's surprise attack on the Last City, backed by the Cabal military's elite Red Legion. *Id.* at 0:39-1:53, 5:04-6:43, 27:00-28:13, 1:27:42-28:23. Ghaul easily subdued the Last City and caged the Traveler, cutting the Guardians off from its Light. *Id.* at 1:53-2:29. For most of the "Red War," Ghaul studies the caged Traveler from his command ship and tries convince the sentient orb to bestow its Light upon him. *Id.* at 16:33-56.

Gameplay in the "Red War" campaign begins during the Cabal's surprise attack on the Last City. *Id.* at 3:39-4:19. Playing as a Guardian who flees the Last City and finds an outpost located near a discarded remnant of the Traveler that restores the Guardian's connection to the Light, the player is first tasked with clearing out an abandoned mine overrun with hostile scavenger insectoids called the Fallen and recovers a signal booster that restores the outpost's long-range communications. *Id.* at 20:48-23:19. Guardian commander, Zavala, sends a message requesting the player travel to Saturn's moon, Titan. *Id.* at 23:37- 26:48. On Titan, the player must defeat a colony of arthropod-like aliens called "Hive" to restore power to the station where the Guardians have gathered. *Id.* at 30:31-32:51, 34:09-37:00. With power restored, the Guardians decrypt intercepted Cabal messages and learn that the Almighty is aimed at the Sun. *Id.* at 55:38-57:48.

Commander Zavala plans for the Guardians to attack the Almighty, and tasks the player with finding two other Guardian commanders, Cayde-6 and Ikora Rey. *Id.* at 57:52-58:58. The player first travels to a planetoid called Nessus in search of Cayde-6, only to find that the Vex, a hostile cyber-organic species, has trapped Cayde-6 in a teleportation loop. *Id.* at 1:00:02-9:50. Among the remains of a crashed spaceship, the player meets the ship's AI operator, Failsafe, who helps the player rescue Cayde-6. *Id.* The player then travels to Jupiter's moon Io and easily locates Ikora Rey, who sends the player to fight through warped, corrupted entities known as the Taken,

6

to find an interplanetary defense system called a Warmind. *Id.* at 1:52:02-59. The Warmind reveals that the Almighty cannot be destroyed without also destroying the Sun. *Id.*

The Guardians reconvene and decide that the player must shut down the Almighty's weapon, rather than destroy it outright. *Id.* at 1:56:19-58:54. To achieve this, the player invades a Cabal base on the outskirts of the Last City, fights through Red Legion warriors, boards a Cabal carrier, kills an elite member of Ghaul's Blood Guard, and steals a spaceship. *Id.* at 2:00:53-5:18. The player then boards the Almighty and destroys its cooling mechanisms, overheating and shutting down its weapon systems. *Id.* at 2:05:27-9:00. With the Almighty is disabled, the Consul urges Ghaul to take the Light by force. Enraged, Ghaul kills the Consul. *Id.* at 2:12:25-15:28.

Back on Earth, the player fights Red Legion warriors through the streets and rooftops of the Last City and is teleported to Ghaul's command ship. *Id.* at 2:15:35-18:31. The player makes their way to the ship deck, where it is revealed that Ghaul has finally taken the Light by force. *Id.* at 2:18:33-24:13. A difficult final battle ensues, wherein Ghaul rises as a massive, godlike avatar. *Id.* In response to Ghaul's hubris, the Traveler releases a wave of Light that destroys its cage, kills Ghaul, decimates the Red Legion, and restores the Light. *Id.* Earth and the Last City are saved.

### 2.    "Curse of Osiris" Campaign

"Curse of Osiris" was the first expansion campaign released for *Destiny 2*. Decl. ¶ 7. In this campaign, the player is tasked with rescuing Ikora Rey's mentor, the legendary Warlock Osiris, who, while researching the "Infinite Forest"—a machine used by the Vex to simulate realities across time—was shown a simulation where the Vex triumphed over humanity. *See* Ex. B at 4:55:05-4:59:45; Ex. F at 2:05-3:50, 6:25-6:52. To save humanity, the player must battle and defeat the campaign's main antagonist, a Vex unit called "Panoptes, Infinite Mind," who oversees the simulated realities generated by the Infinite Forest. *See* Ex. B at 4:58:56-4:59:31; Ex. F at 15:16-16:08, 16:25-18:23, 31:08-35:57.

## IV.    <u>LEGAL STANDARD</u>

Rule 12(b)(6) exists to weed out facially implausible claims and cases from the Court's docket.  *See Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008).  To state a proper cause of action, "a plaintiff must plead specific facts, not mere conclusory allegations." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Complaints require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and will fail if they only make "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing and quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  It is Martineau's burden to set forth sufficient facts that, if accepted as true, would suggest he is entitled to relief.  *Twombly,* 550 U.S. at 556.

"Complaints alleging copyright infringement are no exception to this rule and can be decided as a matter of law."  *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 787 (S.D. Tex. 2009), *summarily aff'd* 381 F. App'x 449 (5th Cir. 2010).  On a motion to dismiss, courts may consider the facts alleged in the complaint and any documents incorporated by reference, including the parties' works.  *See id*. (citing *Collins*, 224 F.3d at 498-99).  The Court thus may properly consider the asserted and accused works for the purposes of this Motion, as they are central to Martineau's claims and heavily referenced in his FAC.  *See id*.  Bungie attaches Martineau's *The Red Legion*, provided to Bungie's counsel by Plaintiff's counsel, and comprehensive, relevant video footage from *Destiny 2* depicting the accused elements.  *See* Exs. A-C, F; FAC ¶¶ 8(a), 222; *see also* Decl. ¶¶ 7-15.

## V.    <u>ARGUMENT</u>

For Martineau to establish copyright infringement, he must "prove that: (1) he owns a valid copyright and (2) [Bungie] copied constituent elements of [his] work that are original."  *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004).  To establish the

second element, Martineau must prove (1) factual copying; and (2) substantial similarity (sometimes referred to collectively as "actionable copying"). *Id.; see also Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007). Martineau alleges ownership of a 2023 copyright registration. FAC ¶ 222. However, despite his amended pleading, he still fails to plead facts establishing that Bungie copied *The Red Legion*, or that the works are substantially similar. As set forth below, Martineau's FAC should therefore be dismissed with prejudice.

### A.    Martineau Cannot Establish Factual Copying

"Factual copying[] can be proved by direct or circumstantial evidence." *Armour*, 512 F.3d at 152. Because he does not allege direct evidence of copying[3], Martineau must plausibly allege that Bungie "had access to the copyrighted work before creation of the infringing work and [] the works contain similarities that are probative of copying." *Id.* (citing *Positive Black Talk, Inc.*, 394 F.3d at 367-68) (noting that direct evidence of copying is "rarely available"); *Busti v. Platinum Studios, Inc.*, 2013 WL 12121116, at *3 (W.D. Tex. Aug. 30, 2013). Absent a sufficient allegation of prior access, Martineau instead must show "such a 'striking similarity' between the two works that the similarity could only be explained by actual copying." *Armour*, 512 F.3d at 152 n.3; *see also Busti*, 2013 WL 12121116, at *3. Martineau's FAC makes clear that he cannot show either form of factual copying and any further amendment would be futile.

### 1.    Martineau Has Not Sufficiently Pled Bungie's Prior Access

To plausibly allege access, Martineau must show Bungie "had a reasonable opportunity to view [his] copyrighted work" before creating *Destiny 2*. *Armour*, 512 F.3d at 152-53. "[S]uch a reasonable opportunity to view must be plausible and cannot be grounded in speculation."

---

[3] Martineau's allegations that Bungie purportedly "directly copied" any given element, *see, e.g.*, FAC ¶¶ 67, 83, 125, 130, 134, 138, 177, are not direct *evidence of* copying that can alone establish factual copying, such as party admissions, witness accounts of copying, or common errors. *See Vallery v. Am. Girl Dolls*, 2015 WL 1539253, at *3 (E.D. La. Apr. 6, 2015), *aff'd*, 697 F. App'x 821 (5th Cir. 2017)).

*Atkinson v. Netflix, Inc.*, 2022 WL 2899275, at *4 (E.D. Tex. May 18, 2022) (citing *Twombly*, 550 U.S. at 555). "[C]ourts have consistently refused to treat internet publication alone as sufficient to [show access]." *Id.* at *6 (int. quotation omitted).

Martineau tries, but fails, to cure his deficient assertions of Bungie's access to *The Red Legion* by adding a number of unsubstantiated and speculative allegations. *See* FAC ¶¶ 15-19, 46-67. These new allegations assert in conclusory fashion that:

- Martineau's work was published in a series of public blog posts on WordPress;
- Bungie was under pressure to develop *Destiny 2* on a compressed schedule;
- Because of that pressure, Bungie developers must have used their technological savvy to search WordPress for terms such as "science fiction," "future," "space," or "aliens"; and
- That hypothetical search displayed Martineau's posts within the returned search results, and Bungie thus "directly copied it in creating Destiny 2."

*Id.* Unfortunately for Martineau, these allegations are insufficient because they "amount[] to nothing more than a 'tortuous chain of hypothetical transmittals.'" *See Armour*, 512 F.3d at 153. Such "speculation is not a substitute for facts." *Vallery*, 697 F. App'x at 825 (allegations that defendant *could have* accessed plaintiff's work from a public novel-writing contest were insufficient to allege access, as plaintiff "fail[ed] to allege facts to support this contention."); *see also Atkinson* , 2022 WL 2899275, at *3-5 (allegations that the defendant, a long-time comic book fan, was likely to have accessed plaintiff's asserted comic book while patronizing or working in a comic store or attending art school insufficient because plaintiff "provide[d] no details beyond 'information and belief' to support such claims . . . [and therefore] has not provided any conceptual link, or a chain of inferences to plausibly establish access."). That Bungie *could have* conducted searches using specific keywords on WordPress thereby accessing Martineau's blog posts is insufficient to plead access and, in turn, factual copying. *See id.* ("It is pure speculation that [Defendant] would inevitably have seen the copyrighted works . . . through fervent searching").

Martineau also baldly alleges that Bungie "encourages its creative developers to look to outside sources for ideas and inspiration," such as from films, art, anime, the military, action heroes, and sports stars, *see* FAC ¶¶ 49, 55-59, but neither substantiates these allegations nor explains how such routine creative research amounts to plausible allegations of accessing his specific writings (much less actionable copying and infringement). He further concludes that Bungie's "creative process" for *Destiny 2* involved "taking ideas" from "various third-party works," "art available online," and "readily accessible online sources." *Id.* ¶¶ 55-56, 65. Even if such conclusory allegations were substantiated, they at best permit only the inference that Bungie's team engaged in the permissible and routine use of unprotectable ideas, which cannot support a claim of copyright infringement. *See id.* ¶¶ 55-57, 65-66*; see infra* at Section V(B)(1)(i).

### 2.    Martineau Has Not Sufficiently Pled Similarities Probative of Copying

Because Martineau fails to sufficiently allege Bungie's prior access to his work, *see supra* at Section V(A)(i), his claim can only survive "if the two works are 'so *strikingly* similar' as to preclude the possibility of [Bungie's] independent creation." *Busti*, 2013 WL 12121116, at *3. (emphasis in original). Striking similarity is a high bar and cannot be met with "a few shared plot points" and "supposedly overlapping scenes." *See Atkinson*, 2022 WL 2899275, at *7 (dismissing for lack of striking similarity where accused scenes "[were] not virtually indistinguishable"); *Vallery*, 2015 WL 1539253, at *3) ("The test for 'striking similarity' is 'stringent' . . . [and] 'the mere existence of multiple similar characteristics is not enough.'"); *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 2014 WL 6982331, at *5 (S.D. Tex. Dec. 9, 2014) (no striking similarity where similarities derived from a "common genre that both [works] share" and where "there are differences . . . that prevent[] the Court from concluding that the only possible explanation for their similarity is copying."). Martineau cannot meet this high bar as a matter of law, as no FAC

11

wordsmithing or invocation of the words "striking similarity" can change that the works *themselves* are dissimilar. *See, e.g.*, FAC ¶¶ 84, 113, 215-217; *see also Iqbal*, 556 U.S. at 678. "The requisite similarity may not be shown by an analysis that alters the actual sequence or construction of plaintiff's work in order to achieve a juxtaposition that makes for greater similarity with defendant's work." 4 NIMMER ON COPYRIGHT § 13D.06 (2024). When assessing striking similarity, the Court must compare *The Red Legion* against *Destiny 2* alone*, and not by the descriptions in the Complaint. *Id*.

The FAC's self-serving summaries of Martineau's work—clearly designed to draw similarities to *Destiny 2*—bear little resemblance to his asserted copyright in *The Red Legion*. Nonlinear and difficult to parse, *The Red Legion* is not similar to *Destiny 2*, much less strikingly so. *The Red Legion* is a disjointed collection of sparse, asynchronous prose and poetry full of obscure and invented language, presented in an avant-garde structure and style that make it difficult, if not impossible, for a reader to discern an overarching narrative (if indeed there is one). The reader is presented with a series of seemingly unrelated and out-of-order tableaux featuring inconsistently represented and under-developed characters and objects—some more prominent but still elusive like Yinnerah, Xionbur, Sinestria, and "atonizers"; and some more ephemeral like the amorphous and titular "Red Legion," unnamed conscripts, legionnaires, Exemplars, engineers, specimens, and "miogas"—which, even when contrivedly (and improperly) recast and rearranged for the purposes of his pleading, do not add up to a coherent, cognizable story remotely similar to *Destiny 2*. In fact, *The Red Legion* omits any conclusion of Yinnerah's much-discussed invasion of Earth and glosses over what ought to be key points in the alleged plot—the actual invasion, human resistance, Yinnerah's triumph, etc. The main perspective of *The Red Legion* is of those aligned with Yinnerah and his invading forces, rather than those resisting his invasion.

In stark contrast, *Destiny 2* is a narrative-rich, interactive, internet-based 3D audiovisual work with a cast of distinct and well-developed characters who chatter constantly about the player's objectives and their opinions on how best to achieve them, expressing personalities, fears, motivations, and complex interpersonal relationships in the process. The narrative of each campaign proceeds fluidly and chronologically—necessarily so, as players must easily understand their objectives and the overarching plot in order to enjoy and engage with the game. *Destiny 2* is also contextualized within the vast and complex lore of the earlier-established *Destiny* universe and franchise, *i.e.*, it exists within an ongoing intergalactic battle between primordial forces of good (the Light) and evil (the Darkness). Accordingly, *Destiny 2* is presented from the vantage point of a Guardian, tasked with protecting humanity, the Last City, and the Traveler, rather than aiding and abetting the alien invaders like most of *The Red Legion* characters and narrators.

Moreover, "[e]lements of similarity that are so common that they might indeed have been independently created by both plaintiff and defendant are not probative of factual copying," and must be disregarded at the Rule 12 stage. NIMMER § 13D.06. As discussed in further detail below, *see infra* at Section V(B), nearly all Martineau's asserted elements—the invasion of Earth, brutal alien overlords, planet-killing superweapons, malfunctioning spaceship reactors, interstellar communications, consciousness transfer, *inter alia*—are unprotectable common themes, characters, and technologies that have appeared throughout the sci-fi genre for over a century, and are original to neither *The Red Legion* nor *Destiny 2*. Indeed, many of these elements appear in the earlier *Destiny* game, which antedates Martineau's asserted work.

*The Red Legion* and *Destiny 2* are not strikingly similar so as to permit the necessary plausible inference of factual copying. No amendment could have cured this inherent deficiency,

let alone the FAC's attempts to rewrite *The Red Legion*.  Dismissal with prejudice on this basis alone is thus warranted.

### B.    The Works Are Not Substantially Similar

Even assuming *arguendo* that Martineau has sufficiently pled factual copying (he has not), his claim still fails because (1) all alleged infringing elements are unprotectable stock themes (*i.e.*, *scènes à faire*) ubiquitous to the genre, or otherwise unprotectable ideas, and (2) the only similarities between the works are unprotectable elements differing drastically in their expression.

### 1.    Unprotectable Element Filtration

To assess substantial similarity, the Court must view *The Red Legion* and *Destiny 2* side-by-side and determine whether, from the perspective of a layperson or "ordinary observer," there exists substantial similarity between the works' *protectable* elements.[4]  *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 550 (5th Cir. 2015) (citations omitted).  Before the Court may assess substantial similarity, however, it must first identify and "filter" out any unprotectable elements of Martineau's work to ascertain whether *Destiny 2* infringed any protectable elements.  *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533-34 (5th Cir. 1994); *see also Nola Spice*, 783 F.3d at 551 & n.6 (filtering out unprotectable elements as first step of analysis).

### i.    *Scènes à Faire and Unprotectable Ideas*

During filtration, the Court must separate out unprotectable "*scènes à faire,* i.e., expressions that are standard, stock or common to a particular subject matter."  *Busti*, 2013 WL 12121116, at *6 (quoting *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1344 (5th Cir. 1994)).  This includes features that, although claimed by Martineau, are in actuality

---

[4] The Court should ignore Martineau's conclusory allegations that the works are substantially or strikingly similar.  *See, e.g.*, FAC ¶¶ 112-113.  *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (holding that the court should not accept "conclusory allegations, unwarranted factual inferences, or legal conclusions.").

"theme[s] or trope[s] that [have] long existed" or "[m]aterial or themes commonly repeated in a certain genre." *Rucker v. Harlequin Enters., Ltd.*, 2013 WL 707922, at *7 (S.D. Tex. Feb. 26, 2013). It also includes claims over elements that are "familiar and widely used," "classic plot feature[s] in works of fantasy and science fiction," and those which "flow[] naturally from the general concept of [a science fiction] world." *See Busti*, 2013 WL 12121116, at *6 (finding that, for example, "aliens . . . on a descending ramp from their respective flying saucers" is a "common, stock scene for works involving aliens, and as such it is unprotectable"). The Court can determine whether an element is *scène à faire* at the pleading stage, without the need to reference any discovery. *See id.* (identifying science fiction *scènes à faire* at the pleading stage); *Abdin v. CBS Broad., Inc.*, 405 F. Supp. 3d 591, 597-99 (S.D.N.Y. 2019) (same and dismissing complaint where works were not substantially similar as a matter of law); *Basile v. Sony Pictures Ent. Inc*., 2014 WL 12521344, at *5 (C.D. Cal. Aug. 19, 2014), *aff'd*, 678 F. App'x 473 (9th Cir. 2017) (same).

Most elements Martineau claims ownership over and copying of are unprotectable *scènes à faire* within the genre of sci-fi and cannot be considered when analyzing substantial similarity between *The Red Legion* and *Destiny 2*. *See Randolph*, 634 F. Supp. 2d at 789. For example, as evidence of purported similarity, Martineau points to the fact that "spaceships are used at similar points in the narratives," that "beacons [are used] as devices for receiving messages," that "encrypted messages are transmitted through beacons . . . [and] must be deciphered," and that both stories feature "extremely powerful weapons that can bring about the destruction of an entire race" and alien "surveillance of Earth." FAC ¶¶ 108, 147, 158, 166. But these sort of sci-fi themes and tropes have been specifically held unprotectable *scènes à faire*. For example, in *Busti*, the court found that "depiction of the aliens first appearing on a descending ramp from their respective flying saucers" and flying saucers "overhead" are examples of unprotectable *scènes à faire*. *See Busti,*

15

2013 WL 12121116, at *1, 6.  The Second Circuit has likewise held that sci-fi "typically involves 'stock themes,' such as space travel, supernatural forces, war games, alien discovery, and adventuring through space," and that "copyright . . . does not protect generic themes and storylines involving aliens or advanced technology."  *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 71 (2d Cir. 2020).  Similarly, "spaceships landing, going on missions, military involvement, [and] central character deaths [are] vague elements and 'scenes-a-faire' of science fiction works."  *Basile v. Los Angeles Film Sch., LLC*, 2019 WL 5377126, at *9 (C.D. Cal. Sept. 30, 2019); *see also Mego Corp v. Mattel, Inc.*, 1978 WL 21347, at *2 (S.D.N.Y. Sept. 29, 1978) (judicially noting "[t]he popularity of the theme of spaceships and space warriors and related subjects is well-known and the success of the motion picture *Star Wars* [and] *Star Trek* and other such vehicles").

Martineau also continues to ignore the idea-expression dichotomy, under which "the expression of ideas, not the ideas themselves" are protected.  *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 241 F.3d 398, 414 (5th Cir. 2001) (*citing Kepner-Tregoe*, 12 F.3d at 533).  Just like the original complaint, the FAC makes untenable claims of ownership over the ideas of, *inter alia*, alien invasions, threatened destruction of Earth, communication beacons sending encrypted messages across space, spaceship transportation/combat, laser-based superweapons, robots with human consciousnesses, sentient AI, and other elements ubiquitous to science fiction.[5]  FAC ¶ 91. Rather than allege ownership of protectable expression, Martineau instead transparently attempts to avoid black letter law with superficial changes to the wording of his pleading.  For example, Martineau removed words such as "concept[s]" and "theme[s]" from the FAC, which Bungie had previously argued betrayed the unprotectable nature of his asserted elements.  *See* Dkt. 11-1 at 16-17; *compare* Dkt. 1 ¶¶ 30, 72, 119, 136, 143-44 *with* FAC ¶¶ 35, 111, 159, 176, 183-84.

---

[5] Ironically, Martineau's FAC copies Bungie's description of these unprotectable ideas verbatim from its original motion to dismiss.  *Compare* FAC ¶ 91 *with* Dkt. 11-1 at 15.

Drafting aside, Martineau's infringement claim still violates the idea-expression dichotomy. For example, when comparing his "atonizer prototype" to *Destiny 2*'s "the Almighty," the only similarities Martineau draws between the two are conceptual: "Both the atonizer prototype and the Almighty *are portrayed as extremely powerful weapons that can bring about the destruction of an entire race*. . . . these weapons are *linked to an antagonistic force . . . to dominate and destroy Earth. . . . Use of these weapons . . . in both works leads to a call for help and resistance*." FAC ¶¶ 147-151 (emphases added). Similarly, Martineau baldly alleges that both works deal with (the extremely generic theme of) a powerful force experiencing internal strife and turmoil. *Id.* ¶¶ 196-197. Martineau also tries to monopolize mere ideas found in *Destiny 2's* "Curse of Osiris," including, for example, narrative devices such as the manipulation of time and "the presence of parallel realities and . . . characters having the power to alter these realities," which raise "ethical questions about free will, destiny, and the morality of prophesying, and altering time or events." FAC ¶¶ 201, 205, 215. As alleged, these are unprotectable science fiction clichés. *See Basile*, 2014 WL 12521344, at *5 (dismissing complaint with prejudice because, *inter alia*, "stock scenes inherent in the portrayal of time travel' such as 'significant consequences as a result of the time travel . . . not protected by copyright law.") (int. quotations omitted).

In sum, none of the themes, concepts, elements, devices, or ideas claimed in the FAC is protectable, nor may they be exclusively "owned" by Martineau.

### ii.     *Indistinctly and Superficially Expressed Elements*

Moreover, the Court must filter out any elements expressed without sufficient detail to distinguish them from the generalized unprotectable concepts from which they derive. Again, because copyright law protects only the *expression* of ideas and not the ideas themselves, "[t]he more a work is general and lacking in detail, the more likely the remaining ideas are to be broad, common, and unprotectable." *Rucker*, 2013 WL 707922, at *17 (citing *Kern River Gas*

*Transmission Co. v. Costal Corp.*, 899 F.2d 1458, 1463 (5th Cir. 1990).  Courts have held that copyright infringement claims must fail when "the similar parts of the parties' works are unprotectible . . . trivial, scattered details."  *Williams v. Crichton*, 84 F.3d 581, 590-91 (2d Cir. 1996) (citation omitted).  The same is true of characters that Martineau insufficiently expresses. *See id.* at 589; *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly").  Courts have found "indistinct stock characters do[] not warrant copyright protection" where, for example, "[n]one . . . is discussed on more than one page of the work, and the characters' personality traits are undeveloped."  *Lewinson v. Henry Holt & Co.*, 659 F. Supp. 2d 547, 574 (S.D.N.Y. 2009).

Martineau has obviously cherry-picked a litany of purported similarities, often mischaracterizing the works to force apples to look like oranges.[6]  Most egregiously, Martineau lays broad claim to many narrative elements, themes, and characters that are only superficially mentioned in his asserted work.  For example, Martineau's entire 115-page work makes a singular reference to "Tononob Station," noting merely that it is an "elevated city that houses a human engineered species," that it "float[s] above what you would refer to as India," and that "Yinnerah wishes to take [it]."  *See* Ex. A at 29; *see also* FAC ¶¶ 178-181.  Similarly, there is only one reference to aliens surveilling or monitoring Earth.  *See* Ex. A at 7 ("We still monitor the ZT920 and ZT930a beings on planets 34-Bc (Earth) and 35-BC (Gala-Tar)."); *see also* FAC ¶¶ 133-138. Likewise, there is but one reference to a spaceship's reactor ("[T]he ship's reactor rejects all

---

[6] For example, Martineau alleges that the cyborg-esque "Exomind" characters of *Destiny 2* (*see supra* at Section V(B)), are created by "transferring human consciousness into robotic bodies through 'Transversive Steps' . . . closely mirroring the concept of 'transversion' in Martineau's work."  FAC ¶ 191.  But "Transversive Steps" is merely the name of a pair of rare, armored boots that *Destiny 2* players may equip to increase their character's running speed. *See* Decl. ¶ 16, Ex. D.  "Transversive Steps" boots have no relation to the *Destiny 2* "Exominds," *see id.* ¶ 18, Ex. G, or transferring human consciousness into robotic bodies, and these boots have seemingly been referenced merely so that Martineau may artificially inflate the perceived similarity between the parties' works.

changes to [translation error] eionboe oeiwbuiou bohein oiobbe . . .") and one express reference to message decryption ("Decrypt and authorize for personal recording.").  *See* Ex. A at 23, *see also* FAC ¶¶ 174-177; 192.  The same is also true of Martineau's asserted "'fail' safe" feature of the "atonizer prototype" (Ex. A at 18) and "The Red Fox" (Ex. A at 20), which are each referred to only once each in all 115 pages of *The Red Legion*, and introduced with either minimal explanation (*e.g.*, "'fail' safe" (Ex. A at 18) ("There is a 'fail' safe on the digital input panel — it will reverse all effects of the enhancement beam — and permanently alter the physics of the surrounding locale for approximately 4 mega-secs")) or none at all (*e.g.*, "the Red Fox" (Ex. A at 20) ("The Red Fox has set out to obtain the Dr. specifically assigned to the prototype atonizer.").

Martineau's FAC claims more unprotectable elements that likewise are insufficiently expressed.  For example, Martineau asserts similar use of the concept of "projections," which he alleges "are used to blend both scientific and supernatural content in both works."  FAC ¶ 217.  However, "projections" are mentioned only once in *The Red Legion*, specifically in the phrase "Your mere attempts at things you refer to as projection. Or sorcery. Or science. It is irrelevant." Ex. A at 31.  Likewise, he claims similar use of the concept of "echoes" which also shows up once in *The Red Legion*, described only as "propaganda messages broadcast on military sub-channels." *Id.* at 19; *see also* FAC ¶ 217.  Such trivial, scattered references lack cognizable expression and are therefore too general to be protectable.  *See Rucker*, 2013 WL 707922, at *17.

To the extent Martineau's stylistic choices—namely, fragmented short epistolary prose and simplistic lyrical verse—excluded the very expressive detail necessary for copyright protection over the claimed elements, that is "the penalty [Martineau] must bear for marking them too indistinctly."  *Nichols*, 45 F.2d at 121.

###### iii.    *Unprotectable Characters*

"Characters are not ordinarily entitled to copyright protection." *Blizzard Entm't, Inc. v. Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1173 (N.D. Cal. 2015) (citing *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003)).  They may be protected only when "'sufficiently delineated' and displaying 'consistent, widely identifiable traits'" such that they may be deemed "especially distinctive." *DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015) (citations omitted).  Martineau's characters lack the detail needed to be distinctive and protectable.

Martineau's Complaint centers on the chief antagonist, Yinnerah, who is described as a powerful, conquering alien overlord with his sights set on Earth.  *See* FAC ¶¶ 25-28.  Yinnerah thus "acts as a classic villain" of science fiction, and "appears only as an anonymous figurehead intent upon achieving his aim."  *See Wooten v. Netflix, Inc.*, 2021 WL 4864744, at *5-6 (N.D. Ga. May 25, 2021).  Martineau never explains what Yinnerah looks like or sounds like, nor does he develop Yinnerah's personality beyond the villainous clichés of power-hungry ambition and senseless brutality. *See, e.g.*, Ex. A at 30, 49, 108.  Absent further creative development and detail, a rudimentary villain like Yinnerah cannot be protected.  *See Allen v. Scholastic Inc.,* 739 F. Supp. 2d 642, 660-61 (S.D.N.Y. 2011) (character unprotectable where author provided "only a few details about [the character], such as where he lives and what he does, but [did] not imbue him with a discernible personality or distinguishable appearance.").  Indeed, Yinnerah himself "speaks" only three times throughout *The Red Legion*, and merely to deliver threats and boast about his power.  *See* Ex. A at 4-5, 25, 30-32.  Yinnerah thus acts as a prototypical alien overlord throughout *The Red Legion*.  Indeed, Yinnerah's "superficiality underscores that his character is but a 'rough idea[] of general nature . . . instead of [a] specific expression and realization of those ideas.'" *Allen*, 739 F. Supp. 2d at 660-61.  Yet despite his sparse treatment and one-dimensionality,

Yinnerah is nonetheless Martineau's most developed character. Therefore, *none* of Martineau's characters is distinctive enough to be protectable. *See id.* at 661 n.5.

Martineau's newly asserted character, Exemplar Forinis, suffers from the same defects. FAC ¶¶ 201-205. Although the FAC describes Forinis as an "archetype of all-knowing guide" possessing "prophetic abilities," a "deep involvement or understanding of temporal mechanics," and as one who "[a]cts and performs actions with other "Exemplars" in order to manipulate the past, observe different individuals through history . . . and steers events towards or away from his specific visions, guiding or warning them about the possible apocalyptic events," *id.*, the character appears just once in *The Red Legion*: "Exemplar Forinis has foreseen a gap in time, as his prophecies have been accurate thus far. The catalyst for the invasion begins." Ex. A at 88. Forinis is not expressed with the requisite detail to be a protectable figure—he is, as the FAC describes, an unprotectable "archetype."

### iv.  <u>Titles, Names, and Other Short Phrases are Unprotectable</u>

Finally, it is axiomatic that mere words, short phrases, and character names do not merit copyright protection. *See Batiste v. Najm*, 28 F. Supp. 3d 595, at 613 (E.D. La. 2014); *DuBay v. King*, 844 F. App'x 257, 265 (11th Cir. 2021) (citation omitted). Thus, the Court should also ignore Martineau's claim over names and short phrases, including "The Red Legion" (in both works, a military unit styled after the ancient Roman tradition), "legionaries/legionnaires" (in both works, combatants organized within a legion), "The Red Fox" (a spaceship in Martineau's work v. the "Skulking Fox," one of more than 400 named spaceships in *Destiny 2* (Decl. ¶ 17, Ex. E)), "fail safe" (a conventional fail safe in Martineau's work v. a non-player character "Failsafe" in *Destiny 2* (*id.* ¶ 19, Ex. H)), "Torka" (a once-appearing character in *The Red Legion* (Ex. A at 49) v. *Destiny 2's* "Ikora [Rey]"), and "Infinite Programming" (title of one of Martineau's writings v. "Infinite Forest," a Vex time simulator in *Destiny 2* and "Beyond

Infinity," a *Destiny* 2 mission).  The expression of these names and short phrases lacks sufficient detail to be protectable.  *Nichols*, 45 F.2d at 121.

Martineau also ignores established law that the works must be compared in their entirety, *see Vallery*, 2015 WL 1539253, at *3, and improperly claims actionable similarity between a handful of short phrases shown in out-of-context excerpts.  *See* FAC ¶¶ 198-200, 213-214.  For example, Martineau compares *The Red Legion* line, "The universe, the galaxy, the planetary alignment that it sits **in the eye of a mioga**," with the *Destiny 2* line, "And the universe watches us **with envious eyes**." *Id.* ¶ 200.  Other than use of the words "eye" and "universe," there is no substantive similarity between these phrases, as the former metaphorically locates the universe in the eye of a beast, while the latter is synecdoche for covetous observers.  Martineau even manipulates quotes to manufacture similarity where there is none.  For example, he compares *The Red Legion* line "**Her name is** Daon Sinestria Tion. **Her King** is Tiociv Sealnoroh," with the misquoted *Destiny 2* line "**Her name is** Sagira…. And **her Guardian** is Osiris," *id.* ¶ 214, and in doing so, obscures via ellipses additional dissimilar content from the *Destiny 2* line and adds the word "is" to enhance perceived similarity.  *See* Ex. F at 4:43-4:52 ("Her name is Sagira. I've known her a very long time. And her Guardian, Osiris.").

Because names, titles, stock characters, and *scènes à faire* are "freely available for authors and creators to use in their creative works," and short phrases are unprotectable, the Court should not consider Martineau's claims over these in its substantial similarity analysis.  *See Randolph*, 634 F. Supp. 2d at 789; *Batiste*, 28 F. Supp. 3d at 613.

### C.    The Works as a Whole are Not Substantially Similar

Even assuming *arguendo* that any of Martineau's asserted expression is protectable—it is not—the only similarities the works share are in their use of generalized, unprotectable elements common to the sci-fi and space fantasy genres, and identifiably similar only when "extracted from

their context, placed side-by-side, and framed with well-chosen comparative language, as [Martineau's] counsel has skillfully done." *See Busti*, 2013 WL 12121116, at *5.  But neither the parties nor the Court may rely on summaries and lists of purported similarities.  *See Randolph,* 634 F. Supp. 2d at 792 (explaining that the similarity analysis is "a comparison properly made without the plaintiff's aid or suggestions") (int. quotation omitted); *see also Williams*, 84 F.3d at 590 (lists of specific instances of similarity prepared by an author alleging infringement are "'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works' and "[s]uch a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another.")  (int. citations omitted)).  In comparing the works side-by-side, the Court must look at the works in their entirety, *see Vallery*, 2015 WL 1539253, at *3, and will find them facially dissimilar to the ordinary observer in nearly every way.

Whereas Martineau's work is a text-based avant-garde alien invasion story presented non-linearly through a mix of fragmented prose and abstract verse, *Destiny 2* is a massive, multiplayer online mythic space fantasy roleplaying videogame that involves dozens of interactive campaigns filled with 3D gameplay and cinematic cutscenes about a multitude of subjects.  The overall look and feel of both works are also markedly different—Martineau's writings are sparse, tonally bleak, non-linear, and difficult to parse, while *Destiny 2* is a lush, vivid, auspicious, and cohesive audiovisual work that carries players through a series of narrative-rich campaigns.  *See Busti*, 2013 WL 12121116, at *5 (finding that a "work as a whole [was] in fact strikingly different, rather than similar" where it employed different visual aspects, tones, feels, and themes).

To the extent any plot or narrative can be gleaned from Martineau's work, it is clearly not substantially similar to *Destiny 2* or any of its campaigns, including the "Red War" and "Curse of

Osiris."  Through fleeting glimpses of narrative action and experimental verse, *The Red Legion* centers on Yinnerah, an alien overlord who may have once helped create Earth, but also seeks to conquer it with his alien forces.  While *The Red Legion* never confirms if Yinnerah succeeds, it waxes from various perspectives about Yinnerah's rise from court jester to overlord, and his might, cruelty, and godlike power (which is only alluded to, but never demonstrated directly).

In *Destiny 2*'s "The Red War" campaign, Ghaul seeks to obtain the power of the Light from the sentient, celestial orb known as the Traveler, which protects the Last City on Earth.  To do that, he must convince the Traveler that he is worthy of the Light, or attempt to take the Light by force.  After he obtains the Light, Ghaul intends to use the Almighty to destroy the entire Solar System, including Earth.  The "Red War" plot primarily unfolds from the vantage point of a Guardian player seeking to foil Ghaul's plans.  In contrast, it appears—and Martineau conclusorily alleges—that Yinnerah's initial goal is to subjugate humanity and to be feared and worshipped like a god—a recurring theme that Martineau explores only indirectly through several odes referencing deities.  *See, e.g.*, Ex. A at 32, 42, 84.  Tellingly, a single, off-hand reference to Yinnerah's desire to capture a floating city station cannot align the central goals of Ghaul with those of Yinnerah merely because the objects of their interests float in space above Earth.

The "Curse of Osiris" bears even less similarity to *The Red Legion*.  Although the FAC alleges that the "Exemplars" in *The Red Legion* are a "fellowship that guards timelines," such context is not provided by the asserted work, which merely references that Exemplar Forinis has made prophecies, and that two other Exemplars have chosen "fools."  *See* FAC ¶¶ 202, 207-208; Ex. A at 56-57, 88.  That is the extent of Martineau's claim of ownership over the ideas of prophesying and time manipulation.  But *The Red Legion*'s treatment of these concepts is vastly different from their treatment in the "Curse of Osiris" campaign.  In *Destiny 2,* Osiris is a legendary

24

Warlock fixated on the Vex alien species, and, while studying their time simulation machine, saw a future in which the Vex were victorious over humanity.  *See* Ex. B at 4:55:05-4:59:45.  Osiris informs the Guardians of this prophecy and instructs the player to defeat the powerful Vex unit responsible for the time simulations.  *Id.*  Critically, Osiris, unlike the Exemplars, is not himself a seer—rather, alien Vex magic is responsible for the future simulations, and Osiris is merely a witness.  Osiris is also a fleshed-out character, with an established history, relationships, and narrative role helping humanity save itself from the Vex, while *The Red Legion*'s Exemplars are merely an unembellished vehicle for introducing a foreboding prophecy of apocalypse.

In light of the obvious differences in feel, tone, plot, narrative structure, dialogue, character development, and medium, the Court should find "that no reasonable jury could find that the two works are substantially similar," or that any similarities "pertain only to unprotected elements of the plaintiff's work."  *Buckman v. Citicorp*, 1996 WL 34158, at *3 (S.D.N.Y. Jan. 30, 1996) (granting Rule 12(b)(6) motion).  Further, the Court should find that any attempt to amend would be futile, as side-by-side comparison establishes that the works are neither strikingly similar as a matter of factual copying, nor substantially similar as a matter of actionable copying.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Bungie respectfully requests that the Court dismiss Martineau's copyright infringement claim with prejudice, and award Bungie its defense fees and costs based on the objective unreasonableness of Martineau's amended claims.  *See Keck v. Mix Creative Learning Ctr., L.L.C.*, 116 F.4th 448, 458 (5th Cir. 2024) (quoting *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 588-89 (5th Cir. 2015)); 17 U.S.C. § 505; *see also Randolph*, 634 F. Supp. 2d at 787, 794-96 (holding that claims were "if not frivolous . . . objectively unreasonable" where plaintiff identified points of similarity that, "as a matter of settled law, are not copyrightable.")

Date: April 7, 2025

Respectfully submitted,

IRWIN FRITCHIE URQUHART MOORE & DANIELS, LLC

/s/ *Darleene Peters*
Darleene Peters (#25638)
Connor W. Peth (#39499)
Irwin, Fritchie, Urquhart & Moore, LLC
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone: 504-310-2100
Facsimile: 504-310-2101
dpeters@irwinllc.com
cpeth@irwinllc.com

**DLA PIPER LLP (US)**
Tamar Y. Duvdevani (*pro hac vice*)
Jared Greenfield (*pro hac vice*)
1251 Avenue of The Americas, 27th Fl.
New York, New York 10020
Telephone: 212-335-4500
Facsimile: 212-335-4501
tamar.duvdevani@us.dlapiper.com
jared.greenfield@us.dlapiper.com

***Counsel for Bungie, Inc.***